ALEXANDER ROCHINSKY AND MARY ROCHINSKY, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. STATE OF NEW JERSEY, DEPARTMENT OF TRANSPORTATION, DEFENDANT-APPELLANT, AND COUNTY OF ESSEX AND TOWN OF NUTLEY, DEFENDANTS.

Argued October 13, 1987—Decided May 23, 1988.

*Benjamin Clarke,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Benjamin Clarke* and *Madeleine W. Mansier,* Deputy Attorney General, on the brief).

*Barry Fredson* argued the cause for respondents (*Goldstein, Ballen, O'Rourke & Wildstein,* attorneys).

*Marc A. Vaida* and *David G. Paul* submitted a letter brief on behalf of *amici curiae,* New Jersey League of Municipalities and the New Jersey Institute of Municipal Attorneys (*Vaida and Vaida,* attorneys).

The judgment of the Court was delivered by

STEIN, J.

In this case we consider whether the absolute immunity for snow-removal activities conferred on public entities by our decision in *Miehl v. Darpino*, 53 *N.J.* 49 (1968), was preserved by the enactment of the Tort Claims Act, *N.J.S.A.* 59:1–1 to 14–4 (the Act). We conclude that the Act did not abrogate that immunity.

The facts are uncomplicated. On February 11 and 12, 1983, a major snowstorm deposited more than sixteen inches of snow in and around Essex County. The New Jersey Department of Transportation (DOT) and its contractors performed snow-removal activities in the area from 9:00 a.m. on February 11, 1983 until 11:30 p.m. on February 13, 1983. DOT continued cleanup operations thereafter during normal working hours. On February 14, 1983, plaintiff Alexander Rochinsky was a passenger in a motor vehicle that overturned in the right southbound lane of Route 21 in Nutley, New Jersey. Plaintiff and his wife filed a complaint against defendants seeking damages for his injuries. The complaint alleged that defendants carried out snow removal in a "grossly negligent, hazardous and reckless manner * * * as to cause and create a dangerous condition on the highway." In answers to interrogatories, plaintiffs amplified their description of the accident, alleging that the lane in which the vehicle was traveling "ended due to a snowbank," and attributing the accident to defendants' "inadequate snow removal * * * specifically, the partial plowing of a major roadway creating a snowbank ending the lane of traffic without warning and without regard to traffic circumstances."

The DOT invoked the *Miehl* immunity and moved for summary judgment. The trial court was faced with conflicting Appellate Division holdings on the question whether the Tort Claims Act preserved the *Miehl* immunity. In *Manca v. Borough of Hopatcong*, 157 *N.J.Super.* 67 (App.Div.), *certif. denied*, 77 *N.J.* 480 (1978), the plaintiff alleged that her accident had been caused by a public entity's snow-removal activities that had

narrowed the road width and allowed icy ruts to form. The court rejected plaintiff's argument that the Act superseded judicial decisions predating its adoption. Affirming the summary judgment granted in favor of the public entity, the court found nothing in the Tort Claims Act that reflected a "legislative intent to abolish the immunity established in the area of discretionary municipal activities typified by *Miehl." Id.* at 73.

A different panel of the Appellate Division reached the opposite conclusion in *Paternoster v. New Jersey Transp. Dep't,* 190 *N.J.Super.* 11 (App.Div.), *certif. denied,* 96 *N.J.* 258 (1983). In that case, a three-vehicle collision occurred when the driver of one vehicle entered an intersection and failed to observe two other approaching vehicles. Plaintiffs alleged that the accident was caused by the presence of high snowbanks at the corner of the intersection. The State had lowered the height of these snowbanks on two occasions in the days preceding the accident. The court ruled that because *Miehl* was a pre-Tort Claims Act case, it was no longer controlling. *Id.* at 17. It relied on *N.J.S.A.* 59:2–3(d), which exposes a public entity to liability "for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources," if that determination was "palpably unreasonable." The court also noted that subsection (d) distinguishes discretionary functions from ministerial functions and provides that *N.J.S.A.* 59:2–3 does not insulate the performance of ministerial functions from liability. The court concluded that the conduct of the public entities in the case before it could not be accorded immunity as a matter of law and had to be measured against the "palpably unreasonable" standard. *Id.*

In this case the trial court followed *Manca* and granted the DOT's motion for summary judgment, but the Appellate Division reversed. *Rochinsky v. State, Dep't of Transp.,* 214 *N.J.Super.* 525 (1986). The court reasoned that the Legislature intended pre-existing common-law immunities to survive only to the extent they were consistent with the Act. *Id.* at 528.

Because the court interpreted *Miehl* as establishing immunity for snow-removal activities involving both discretionary decisions as well as ministerial operations, it concluded that *Miehl* was inconsistent with *N.J.S.A.* 59:2–3 and therefore was modified by the Act. *Id.* at 529. The court also held that *Miehl*'s immunity was abrogated by *N.J.S.A.* 59:4–7, which affords public entities immunity from liability only for injuries caused solely by weather conditions in their natural state, but not for injuries caused by a combination of weather conditions and snow-removal activities. We granted certification, 107 *N.J.* 124 (1987), and now reverse.

## I

In 1972, the Legislature enacted the Tort Claims Act in response to mounting judicial disfavor with the doctrine of sovereign immunity. This Court had observed that "[sovereign] immunity from tort liability * * * [had] fallen into considerable disrepute." *B.W. King v. West New York*, 49 *N.J.* 318, 324 (1967). We acknowledged that "the difficulty with the articulation of a substitutionary rule lies in the ascertainment and expression of a perimeter for liability," and held that "the problem should be approached on * * * a gradual case by case basis." *Id.* at 324, 325. We also observed that "[t]he analytical approach ought not to be one of asking why immunity should not apply in a given situation but rather one of asking whether there is any reason why it should apply." *Id.* at 325. Three years later we speculated that a comprehensive legislative solution to the question of when public entities should be held liable in tort had "been delayed by the difficulty inherent in expressing a doctrine * * *." *Willis v. Department of Conservation & Economic Dev.*, 55 *N.J.* 534, 539 (1970). We concluded that until the Legislature acted, it was "time for the judiciary to accept * * * responsibility and adjudicate the tort liability of the State itself." *Id.* at 540; *see also P.T. & L. Constr. Co. v. Commissioner of Transp.*, 55 *N.J.* 341 (1970) (abolishing the State's immunity in contract actions).

In the midst of this gradual erosion of judicial tolerance for the doctrine of sovereign immunity, public entities were held to be immune from liability for negligent snow removal. *Miehl v. Darpino, supra,* 53 *N.J.* 49. In *Miehl,* the City of Hammonton had received a heavy snowfall. Snowplowing operations at the intersection of two streets had left snowbanks on the corners of the intersection. Only a narrow passage in the snow bank allowed pedestrians to enter the intersection. Plaintiff, who was attempting to cross one of the streets, traversed the passageway, took several steps to his left, and waited for a lull in traffic. An approaching car veered toward him. Plaintiff tried to avoid the vehicle, but was struck because he was unable to find an opening in the snow through which he could regain access to the sidewalk. He alleged that his injuries were caused by negligent snowplowing.[1] This Court, through Justice Haneman, acknowledged that "the law of municipal tort liability [was] going through a metamorphosis," and analyzed the snow-removal function to "determine whether the present situation [snow removal] is one in which, as a matter of policy, the municipality should not enjoy immunity, but rather should be subject to * * * liability." *Id.* at 53.

Focusing on the unique challenge snow removal poses for public entities, Justice Haneman concluded that this was an activity for which public-entity immunity was particularly essential. He reasoned:

> Snow is a common enemy interfering with normal pedestrian and vehicular traffic and on occasion results in a complete paralysis thereof. Drastically curtailing commerce and industry, it also endangers the general public safety as well, since police, fire, ambulance and medical services are unable to function efficiently throughout the entire community. The need for snow removal

---

[1] Justice Handler, concurring in part and dissenting in part, suggests that the hazard created in *Miehl* was much less severe than the hazard created by the public employees in this case "who created and left a mound of snow in the middle of a travelled highway." *Post* at 419. The validity of that observation would obviously depend on the quality of plaintiffs' proofs. The allegations in the complaint and the answers to interrogatories are singularly uninformative concerning the magnitude of the hazard posed by the "snowbank" on Route 21.

becomes imperative, and the municipality although not duty bound to so act, is under great pressure to exercise its governmental function and alleviate the condition. The cost of snow removal even to a limited extent is great.

Frequently, the area contiguous to plowed streets, including private driveways and sidewalks, is encumbered by additional snow through street plowing. To accede to plaintiff's thesis would be to require a municipality to completely remove all snow and ice—to in effect "broom sweep" all the traveled portion of the streets, driveways and sidewalks where natural snowfall has been disturbed by any removal of street snow. Only in this manner could a municipality be certain that no accident could occur from the creation of a "new element of danger." Such a requirement would impose upon the municipalities of this state a duty not only impractical but also well-nigh impossible of fulfillment. The high cost of such an undertaking could make the expense of any extensive program of snow removal prohibitive and could result in no program or in an inadequate partial program. Patently, some cleaning of snow is better than none. The public is greatly benefited even by snow removal which does not attain the acme of perfection of "broom swept" streets. Relief from fallen snow which does not eliminate all danger of accident is better than none.

The unusual traveling conditions following a snowfall are obvious to the public. Individuals can and should proceed to ambulate on a restricted basis, and if travel is necessary, accept the risks inherent at such a time. To require the individual members of the public to assume the relatively mild additional danger presented by accumulated piles of snow resulting from street snow removal is a minor sacrifice to exact when the alternative could be municipal failure to eliminate the far greater danger caused by permitting snow to remain as deposited by natural forces. The public benefit arising from snow removal far outweighs any slight, private detriment which could accompany such a municipal act. [*Id.* at 53–54.] [2]

In response to this evolving body of case law dealing with tort liability of public entities, the Attorney General prepared a comprehensive report on sovereign immunity which led to the enactment of the Tort Claims Act.[3] The law became effective

---

[2] Justice Handler asserts that "*Miehl* intended to immunize conduct that * * * is intrinsically discretionary." *Post* at 420. We read *Miehl*, however, as rejecting the discretionary-ministerial distinction and adopting a broad-based immunity for snow-removal activities. As the Court stated, "there are certain kinds of acts or omissions of government, no matter how they are categorized, defined, or labelled or how governmental immunity from suit is to be regarded, which should not give rise to tort liability." *Miehl, supra,* 53 *N.J.* at 54 (quoting *Hoy v. Capelli,* 48 *N.J.* 81, 87 (1968)).

[3] The Attorney General actually began this study in 1966 pursuant to statutory command. *See N.J.S.A.* 52:17B–4.1. Specifically reacting to *Willis* and *P.T. &*

on July 1, 1972, and contained the following legislative declaration:

> The Legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity. On the other hand the Legislature recognizes that while a private entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carrying out the above legislative declaration. [*N.J.S.A.* 59:1–2.]

The first substantive section of the Act establishes the analytical framework to be used in resolving questions of governmental immunity: "Except as otherwise provided by this act, a public entity is not liable for an injury * * *." *N.J.S.A.* 59:2–1(a). Further, "[a]ny liability of a public entity established by this act is subject to any immunity of the public entity and is subject to any defenses that would be available to the public entity if it were a private person." *N.J.S.A.* 59:2–1(b).

The Comment [4] to this section reveals the Legislature's overriding objective. It states that *N.J.S.A.* 59:2–1(a) "provides that the basic statutory approach of the [Act] shall be that immunity of all governmental bodies in New Jersey is re-established." In drafting section 2–1(a) the Legislature expressly adopted the reasoning of the California Law Revision Commission which is embodied in the California Tort Claims Act, Cal. Gov't Code § 810 *et seq.* The paramount concern was that a statute

---

*L.,* however, Attorney General Kugler stated that "a more intensive examination of the subject was required." Report of the Attorney General's Task Force on Sovereign Immunity (1972) (Task Force Report), at 1.

[4]The Comments following certain sections of the statute were taken from the Report of the *Attorney General's Task Force on Sovereign Immunity—1972,* and accompanied the Act during its consideration by the Legislature. They have the precedential weight and value of legislative history. See *Costa v. Josey,* 83 *N.J.* 49, 61 n. 1 (1980) (Clifford, J., dissenting).

imposing general liability, limited only by specified statutory immunities, would provide public entities with little basis on which to budget for the payment of claims and judgments for damages. The Comment rejected the concept of a statute that imposed liability with specific exceptions, expressing concern that such a statute would greatly increase the amount of litigation and the attendant expense that public entities would face. Instead, the Attorney General's Report recommended legislation providing "that public entities are immune from liability unless they are declared to be liable by an enactment." *N.J.S.A.* 59:2-1 Task Force Comment.

The Legislature specifically rejected the rationale favoring governmental liability expressed in *B.W. King, supra,* 49 *N.J.* 318 observing that

> this approach is no longer necessary in light of this comprehensive Tort Claims Act. Rather the approach should be *whether an immunity applies and if not, should liability attach.* It is hoped that in utilizing this approach the courts will exercise restraint in the acceptance of novel causes of action against public entities. [*N.J.S.A.* 59:2-1 Task Force Comment (emphasis supplied).]

Subsection 2-1(b) reflects the Legislature's intent to preserve common-law immunities:

> Subsection (b) is intended to insure that any immunity provisions provided in the act *or by common law* will prevail over the liability provisions. It is anticipated that the Courts will realistically interpret both the statutory and common law immunities in order to effectuate their intended scope. [*N.J.S.A.* 59:2-1 Task Force Comment (emphasis supplied).]

We have held that the plain meaning of *N.J.S.A.* 59:2-1 firmly establishes that "immunity is the dominant consideration of the Act." *Kolitch v. Lindedahl,* 100 *N.J.* 485, 498 (1985) (O'Hern, J., concurring); *accord Birchwood Lakes Country Club v. Medford Lakes,* 90 *N.J.* 582, 596 (1982). Even when one of the Act's provisions establishes liability, that liability is ordinarily negated if the public entity possesses a corresponding immunity. *See Malloy v. State,* 76 *N.J.* 515, 521 (1978) (giving priority to licensing function immunity provided by *N.J.S.A.* 59:2-5 over liability established by *N.J.S.A.* 59:2-2); *see also Costa v. Josey,* 83 *N.J.* 49, 61 (1980) (Clifford, J., dissenting) (finding Comment to section 2-1(b) to be "as explicit as possible").

Section 2–1(b) establishes the principle that even common-law and statutory immunities *not* contained in the Act can prevail over the Act's liability provisions. *See In re Martin,* 90 *N.J.* 295, 335 (1982) (provision of Casino Control Act, *N.J.S.A.* 5:12–80(b), granting immunity for any disclosures of confidential information on employment applications given full effect in light of *N.J.S.A.* 59:2–1(b)); *Timber Properties, Inc. v. Chester Township,* 205 *N.J.Super.* 273 (App.Div.1984) (holding that common-law rule that municipal legislators enjoyed absolute immunity from individual monetary liability "was preserved under the Tort Claims Act"); *Trimblett v. State,* 156 *N.J.Super.* 291 (App.Div.1978) (imputing to public entities the pre-existing statutory immunity afforded private landowners against liability to one who uses the landowner's premises for sport or recreation activities); *see also Birchwood Lakes Colony Club v. Medford Lakes, supra,* 90 *N.J.* 582 (employing pre-Act common-law theories in assessing public entity liability for nuisance actions); *Burke v. Deiner,* 97 *N.J.* 465 (1984) (interpreting common-law and statutory immunities in the context of defamation claim by director of parking authority against commissioners who had participated in resolution discharging him).

There are three principal liability sections in the Act. *N.J.S.A.* 59:2–2, incorporating the doctrine of *respondeat superior,* provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances."

*N.J.S.A.* 59:2–3 includes both immunity and liability provisions:

Discretionary activities.

a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;

b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;

c. A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase

of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adeqate governmental services;

d.  A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel *unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.* [Emphasis supplied.]

Finally, *N.J.S.A.* 59:4-2 deals with the liability a public entity may incur for dangerous conditions of its property either created by an employee of the public entity or of which the public entity had actual or constructive notice.   If *Miehl* has been abrogated by the Act, this would be the primary section that establishes liability for snow-removal activities.   It reads as follows:

Liability generally.

A public entity is liable for injury caused by a condition of its property if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

a.  a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition;  or

b.  a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.[5]

▮  Along with the general immunity provisions discussed above, the Act contains several specific immunity provisions. Among them is *N.J.S.A.* 59:4-7, which states:

Neither a public entity nor a public employee is liable for an injury caused solely by the effect on the use of streets and highways of weather conditions.

This subsection does not apply in cases where injuries are allegedly caused by a combination of the weather and other

---

[5]We have held that the determination of palpable unreasonableness is a jury function.  *Brown v. Brown,* 86 *N.J.* 565, 580 (1981).

factors. *See Meta v. Township of Cherry Hill,* 152 *N.J.Super.*
228, 232 (App.Div.), *certif. denied,* 75 *N.J.* 587 (1977).

## II

■ Despite the Legislature's awareness of the *Miehl* immu-
nity when it drafted the Act,[6] nowhere in the statute is the
immunity either expressly abrogated or codified. Plaintiffs
argue that two provisions of the Act indicate the Legislature's
intent to modify *Miehl* and thereby expose snow-removal activi-
ties to the standard set forth in section 4–2. First, plaintiffs
contend that because *N.J.S.A.* 59:2–3d distinguishes between
discretionary decision-making and ministerial functions, abso-
lute immunity was preserved only for discretionary actions.
Therefore, according to plaintiff, the Legislature intended to
abrogate *Miehl,* at least to the extent that *Miehl* shielded the
ministerial aspects of snow-removal activity. We find this
argument to be unpersuasive.

The drafters of this provision expressly acknowledged that
the ministerial-discretionary distinction is too simplistic to be
applied literally. Task Force Report, *supra,* at 44. Virtually
every governmental act includes the exercise of some degree of
discretion. Snow-removal activities involve discretionary deci-
sions at every phase of the process: when to begin snow-remov-
al activities; the order in which streets are to be plowed;
whether to use salt or sand; whether to plow one or two lanes
of a highway; whether to plow certain streets more than once

---

[6]*Miehl* is cited twice in the Comments attending the Act. In the Comment to
*N.J.S.A.* 59:2–3, *Miehl* is listed in a string citation that follows an assertion that
subsection 2–3b specifies an absolute immunity for certain high-level decisions
calling for the exercise of official judgment. Somewhat more significantly, the
Comment to section 4–2, under which plaintiff seeks to hold public entities
liable here, cites *Miehl* following the statement that "[t]his provision comports
generally with the principles of liability established by the New Jersey courts
for public entities in their capacity as landowners." From the context and
placement of these citations, we cannot discern precisely what the Legislature
meant, but the references at least reveal the drafters' knowledge of the *Miehl*
holding.

during a prolonged snowfall. It cannot precisely be determined when such actions cease to be discretionary and become ministerial.

Moreover, even if a particular governmental activity is labelled "ministerial," it does not automatically lose its immune status. Several immunities have been found to cover ministerial as well as discretionary acts. *See Malloy v. State,* 76 *N.J.* 515 (1978) (construing *N.J.S.A.* 59:2-5, which covers the issuance, denial, suspension, or revocation of a permit or license); *Wuethrich v. Delia,* 155 *N.J.Super.* 324 (App.Div.), *certif. denied,* 77 *N.J.* 486 (1978) (construing *N.J.S.A.* 59:5-4 and 5-5, which deal with failure to provide police protection and failure to make an arrest, respectively); *Bosch v. Hain,* 184 *N.J.Super.* 204 (Law Div.1982) (construing *N.J.S.A.* 59:2-6, which provides immunity for failure to inspect public property).

Plaintiffs also assert that the Legislature abrogated *Miehl* because *N.J.S.A.* 59:4-7 establishes immunity only for injuries caused by weather conditions as they exist in their natural state, before snow-removal operations begin. This argument is also unconvincing. The Legislature's decision specifically to shield public entities from liability for injuries caused solely by weather relates to situations not contemplated by *Miehl;* it provides no conclusive evidence of legislative intent about liability for snow-removal activity, one way or the other.

Accordingly, we find no clear evidence of the Legislature's intent to abrogate the immunity established by *Miehl.* To the contrary, we believe the practical effect of *Miehl's* continued applicability is consistent with the underlying goals and purposes of the Act.

The conditions that influenced our holding in *Miehl* twenty years ago are equally prevalent today, if not more so. An expanded network of state and municipal roadways, along with increased traffic volume, renders the task of snow removal a formidable public responsibility. The economy of the State and the safety of its residents depend on an effective and swift

response to snowfalls. That response requires cooperation and coordination of each level of government. Unified governmental action obviously would be inhibited if each public entity factored the threat of tort liability into its individual determination of how to conduct snow-removal activities.

The most recent statistics compiled by the New Jersey Department of Transportation reveal that an average of 18,000 motor vehicle accidents occur annually on snowy or icy roads in New Jersey. NEW JERSEY DEPARTMENT OF TRANSPORTATION—BUREAU OF ACCIDENT RECORDS, SUMMARY OF MOTOR VEHICLE TRAFFIC ACCIDENTS FOR 1984 AND 1985—REPORT 21 (photo. reprints). If the *Miehl* immunity were abrogated, it is probable that a substantial number of these accidents would generate claims of negligent snow removal. Indeed, conditions resulting from virtually any snow-removal activity would provide a tailor-made factual basis for a complaint under *N.J.S.A.* 59:4–2.

To allege a triable cause of action, a plaintiff must show that as a result of a public entity's palpably unreasonable conduct, the entity's property was in a dangerous condition at the time of the accident, that the condition proximately caused the injury, that the dangerous condition created a reasonably foreseeable risk of the kind of injury that was incurred, and that the public entity had notice in sufficient time to protect against the condition or that an act or omission of a public employee acting within the scope of his employment created the condition. *Brown v. Brown, supra,* 86 *N.J.* at 575. By their very nature, however, snow-removal activities leave behind "dangerous conditions." No matter how effective an entity's snow-removal activities may be, a multitude of claims could be filed after every snowstorm. We can conceive of no other governmental function that would expose public entities to more litigation if this immunity were to be abrogated.

Moreover, irrespective of the outcome of such litigation, the cost of defending claims would be substantial. Damage awards

and settlement costs would inevitably drive up public entity insurance costs. It was precisely such a situation that the Legislature sought to avoid by enacting the Tort Claims Act:

> [T]he cost of insurance under [a statute imposing liability with specified exceptions] would no doubt be greater than under a statute which provided for immunity except to the extent provided by enactment, since an insurance company would demand a premium designed to protect against the indefinite area of liability that exists under a statute imposing liability with specified exceptions. [*N.J.S.A.* 59:2–1 Task Force Comment.]

Absent a clear and specific indication that the Legislature intended to impose a liability that could have such a radical impact on the fiscal affairs of public entities, we conclude that the Legislature desired the *Miehl* immunity to remain intact. As the Legislature itself stated when it passed the Act, "[s]hould further study in future years demonstrate that additional liability of public entities is justified, such liability may then be imposed by the Legislature within carefully drafted limits." *Id.*

In reaching this conclusion, we view the common-law immunity for the snow-removal activities of public entities to be among the most significant immunities recognized by judicial decision prior to the adoption of the Act. By preserving common-law immunities not inconsistent with the Act, the Legislature reflected its intention to preserve certain common-law immunities while abrogating others. We acknowledge that it is possible to construe the Act to determine that the *Miehl* immunity is not consistent with the provisions of the Act that impose liability on public entities. In our view, that interpretation is a strained one. We find it difficult to conceive that the Legislature would have dealt so imprecisely with an immunity that has such significance for New Jersey's state, county, and municipal governments. We conclude that the overwhelming likelihood is that if the Legislature had intended to abrogate *Miehl*, it would have done so expressly. If we have misconstrued the legislative intent in this respect, it will be a simple matter for the Legislature to make its intention plain. We are persuaded,

however, that the Legislature was cognizant of the *Miehl* immunity and had no intention to abrogate it.[7]

## III

An indulgent reading of the pleadings and affidavits submitted to the Law Division in connection with the State's summary judgment motion could have suggested the existence of a cause of action under *N.J.S.A.* 59:4-4 that is different from a claim based on negligent snow-removal activity. That section of the Act imposes liability on a public entity for its failure to provide "emergency signals * * * or other devices if * * * necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." The Comment to this section states that "liability may exist for the failure on the part of a public entity to provide an emergency warning signal or device when a condition exists constituting a 'trap' to a person using a street or highway with due care."

This theory of liability was neither alleged specifically in the complaint nor advanced in the briefs or arguments of

---

[7]Justice Handler acknowledges that "the *Miehl* immunity survived the enactment of the Tort Claims Act in some form," *post* at 422, but contends that the immunity is mutable and "subject to judicial modification." *Post* at 423. We do not disagree in principle that under unique circumstances the immunity for snow removal activities could be construed to permit a cause of action against a public entity for conduct so egregious that its insulation from liability would be inconsistent with the public policy that the *Miehl* immunity was intended to foster. We are not confronted with allegations of that nature in this case. Rather, the pleadings and interrogatories read most indulgently disclose the allegation that a "snowbank" of indeterminate size and height obstructed Route 21 due to negligent snow-removal activity. In our view, these allegations do not warrant consideration of the outer limits of the *Miehl* immunity. To the extent they may suggest culpable conduct, unrelated to snow removal activity, consisting of a palpably unreasonable failure to warn of a dangerous condition, that cause of action could be maintained notwithstanding the *Miehl* immunity. *See infra* at 415 to 417.

counsel, although defendants' failure to provide warning devices was referred to in plaintiffs' answers to interrogatories.[8] We observe further that since virtually every snowfall creates hazardous road conditions, the duty to warn addressed by *N.J.S.A.* 59:4-4, applied in the context of a snowstorm, concerns only extraordinary conditions that are qualitatively different from those conditions that would be "reasonably apparent to" or "anticipated by" a careful motorist driving in a snowstorm. *See Meta v. Township of Cherry Hill,* 152 *N.J.Super.* 228, 234 (App.Div.1977).

It is self-evident that unanticipated events in the course of a public entity's snow-removal activities might result in hazardous conditions different in character from the dangers ordinarily expected from a snowstorm. An illustration would be the abandonment of a stalled vehicle, used for snowplowing, in the path of highway traffic. A public entity that was informed about the stalled vehicle but failed to warn motorists of the hazard it presented should not be immunized from liability by virtue of our holding in *Miehl.* Similarly, if snowplowing activity results in the artificial creation of a snowbank that makes a highway impassable, under certain extreme circumstances a duty to warn could arise the breach of which would not be protected by the *Miehl* immunity. Such failure to warn would necessarily involve palpably unreasonable conduct by a public entity, *see Comment* to *N.J.S.A.* 59:4-4, that was separate and distinct from its snow-removal function. Other-

---

[8]Plaintiffs' answer to interrogatory 66 stated the following:

Plaintiff contends that the careless, negligence [sic] and palpably unreasonable actions of the defendants which resulted in the dangerous and hazardous condition aforedescribed being created, permitted and allowed to exist by the defendants herein and/or their agents, servants or employees was furthered by the fact that the defendants failed to provide any emergency signals, signs, markings or other warnings to alert traffic that the right lane on Route 21 would end suddenly without warning due to a snowbank caused by the improper, dangerous and inadequate snow removal procedures taken by defendants herein.

wise, actions pleaded under *N.J.S.A.* 59:4–4 could be used to circumvent the general immunity for snow-removal activities that was established in *Miehl v. Darpino* and preserved by the Act.

On the scant record before us we cannot discern whether such a cause of action exists. The stark allegation in the answer to interrogatories is that the lane "ended due to a snowbank" causing the truck in which plaintiff was a passenger to turn over. In view of the permissive standard that governs a trial court's disposition of motions for summary judgment, *Rosenberg by Rosenberg v. Cahill*, 99 *N.J.* 318, 327 (1985), we will not preclude the plaintiffs from amending their complaint to plead specifically a claim for relief based on *N.J.S.A.* 59:4–4.

Accordingly, the judgment of the Appellate Division is reversed. Plaintiffs are granted leave to file an amended complaint within thirty days to allege a claim for relief based on *N.J.S.A.* 59:4–4.

HANDLER, Justice, concurring in part and dissenting in part.

I concur with the Court's determination that plaintiffs can maintain an action under *N.J.S.A.* 59:4–4 arising out of the Department of Transportation's failure to warn of a hazardous road condition caused by negligent snow removal. However, I disagree with its conclusion that a motorist cannot maintain a personal injury suit against a public entity arising out of an accident caused by the dangerous condition of public property after negligent snow removal.

In my opinion it is highly problematic that the common law immunity recognized in *Miehl v. Darpino*, 53 *N.J.* 49 (1968), was intended to apply in a case such as this, which involves conduct considerably more egregious than simply the discretionary decision to remove snow or merely negligent snow removal. Further, the Court compounds its error in interpret-

ing the common law immunity as applying to this case when it construes the Tort Claims Act as effectively codifying the *Miehl* immunity. In my view, there is no immunity, common law or statutory, that would bar this cause of action. Accordingly, I would rule that under the liability provisions of the Tort Claims Act, the wrongful conduct attributed to defendants would be actionable.

## I.

My belief that the plaintiffs' claims fall outside the intended scope of the *Miehl* immunity is based on the drastic differences in the facts of the two cases. The facts in this case are that on February 14, 1983, three days after a major snowfall, the car in which plaintiff was a passenger ran head on into a snowbank that had been placed in the right southbound lane of Route 21 in Nutley, New Jersey. It is alleged that the accident was caused by the DOT's "inadequate snow removal ... specifically, the partial plowing of a major roadway creating a snowbank ending the lane of traffic without warning and without regard to traffic circumstances." *Supra*, at 402. Fairly read, plaintiffs' complaint thus alleges that the cause of the accident was an extremely hazardous condition obstructing a state highway that would not have been apparent to a person exercising due care.

In contrast, the court in *Miehl* was concerned with a condition of public property following snow removal that was much more common and much less dangerous. The plaintiff in *Miehl* was a pedestrian who, after stepping through a narrow gap in a snowbank at an intersection, was struck by a car as he attempted to cross the street. The basis of his claim against the City of Hammonton was that the height of the snowbanks caused by snowplowing prevented him from getting back onto the sidewalk and out of the way of the oncoming car. *Miehl, supra,* 53 *N.J.* at 51. His claim was viewed by the Court as tenuous at best. The Court stated that in order to grant plaintiff relief, it

would have to allow recovery whenever snow removal created a new element of danger in addition to the hazard caused by natural snow accumulation, implying that a municipality would have to dispense with all snow removal to avoid liability. *Id.* at 52. Concluding that some snow removal is better than none, the Court stated:

> To require the individual members of the public to assume the relatively mild additional danger presented by accumulated piles of snow resulting from street snow removal is a minor sacrifice to exact when the alternative could be municipal failure to eliminate the far greater danger caused by permitting snow to remain as deposited by natural forces. [*Id.* at 54.]

The factual assumption underlying the Court's reasoning in positing an immunity for snow removal activities in *Miehl* is that "[t]he unusual travelling conditions following a snowfall are obvious to the public." *Miehl, supra,* 53 *N.J.* at 54. Under no stretch of the facts would the circumstances in *Miehl* be analogous to the conduct of public employees who created and left a mound of snow in the middle of a travelled highway, creating a treacherous hazard to motorists. The hazard created in this case is hardly a "relatively mild additional danger presented by accumulated piles of snow." *Id.*

Moreover, the Court in *Miehl* cast its rule in terms of assumption of risk: "if travel is necessary [individuals should] accept the risks inherent at such a time[,]" *id.,* thus reflecting its belief that the risk being immunized was one of which the plaintiff was or should have been aware. The plaintiffs here, however, contend that the harm was not apparent to a person exercising due care. Plaintiffs present a claim by a motorist that a governmental entity has a duty to warn if it is or should be aware of a hazardous road condition caused by snow removal that would not be reasonably apparent to, or anticipated by, a motorist exercising due care. This position is not inconsistent with *Miehl.* A month prior to the *Miehl* decision, the Court, in *Bergen v. Koppenal,* 52 *N.J.* 478 (1968), rendered a unanimous decision holding that "a duty may be found if a police officer learns of an emergency road condition which is likely not to be observed by a motorist and which holds an unusual risk of

injury." *Id.* at 480. In this case the plaintiffs posit "an emergency road condition" not readily observable, and unusually dangerous.

Furthermore, it cannot be overemphasized that the Court in *Miehl* intended to immunize conduct that not only does not add measurably to the risks naturally created by snow but also is intrinsically discretionary. The discretionary nature of a municipality's decision as to what snow to remove, when to remove it, and how to remove it is more clearly expressed in the earlier snow removal case of *Amelchenko v. Borough of Freehold*, 42 *N.J.* 541 (1964). There the Court observed:

> establishment of a general method of handling snowstorms is a matter of planning.... Such decisions cannot be subject to review in tort suits for damages, for this would take the ultimate decision-making away from those who are responsible politically for making decisions. [*Id.* at 550.]

It is significant that the *Report of the Attorney General's Task Force on Sovereign Immunity* (1972), discusses *Miehl* and *Amelchenko* as government discretion cases, *id.* at 39–40, and the Comment to *N.J.S.A.* 59:2–3c cites *Miehl* and *Amelchenko* as examples of high level decisions protected by absolute immunity. *Willis v. Department of Conservation and Economic Dev.*, 55 *N.J.* 534 (1970), the case in which the Court abrogated common law sovereign immunity, also discusses *Amelchenko* and *Miehl* as examples of governmental discretion. *Id.* at 540–41.

There is no suggestion in the allegations that the improper conduct on the part of DOT and its contractors involved "discretion," "ultimate decision making" "a general method of handling snow storms" or "a matter of planning." *Amelchenko*, 42 *N.J.* at 550. Contrary to the intimations of the majority, the Tort Claims Act has not abandoned the ministerial-discretionary distinction. In fact, the Act expressly recognizes and relies on the distinction. *See N.J.S.A.* 59:2–3d ("Nothing in this section [defining liability for discretionary activities] shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.").

Furthermore, the Act does not provide blanket immunity for all discretionary activities. *N.J.S.A.* 59:2–3d provides that a public entity can be held liable if its exercise of discretion in the allocation of existing resources to meet competing demands is found to be palpably unreasonable. While the reference to *Miehl* and *Amelchenko* in the Comments to *N.J.S.A.* 59:2–3c can fairly be read as preserving a public entity's absolute immunity with regard to suits arising from its alleged failure to allocate adequate resources for snow removal activities, the Act evinces no intent to classify all snow removal activities as discretionary or to immunize any governmental activity that involves some degree of discretion. Thus, even if the *Miehl* immunity did survive the passage of the Tort Claims Act, and indeed, was intended to be statutorily codified, I do not think it extends to the facts of this case.

In my opinion, the conduct alleged here is so egregious as to call for liability under *N.J.S.A.* 59:4–2, imposing liability on governmental entities for injuries caused by the dangerous condition of public property. Taking plaintiffs allegations as true, the accident in this case was caused by the State or its agents creating an artificial wall of snow that abruptly closed off a lane of traffic on a major state highway. While public policy may be furthered by requiring motorists to assume the mild additional risk of unplowed or poorly plowed streets, the conduct alleged here is different in kind from the commonplace hazards of winter driving and snow removal. Indeed, if the obstruction had consisted of anything other than snow, there is little doubt that plaintiffs would be allowed to maintain their suit. *See Hartman v. City of Brigantine,* 42 *N.J.Super.* 247, 253 (App.Div.1956) (wife of motorist killed when his car rammed a mound of dirt left in the road allowed to maintain suit against municipality), aff'd, 23 *N.J.* 530 (1957). I see no reason why plaintiffs' right to recover should depend solely on the composition of the obstruction.

## II.

Furthermore, if the common law immunity of *Miehl* is otherwise applicable, it remains subject to judicial modification or partial abrogation, taking into account the particular tortious conduct in this case. While there is little question that the *Miehl* immunity survived the enactment of the Tort Claims Act in some form, it does not follow that *N.J.S.A.* 59:2–1 has codified or frozen the immunity.

The Tort Claims Act does not expressly incorporate existing immunities. Instead, the Comment to *N.J.S.A.* 59:2–1(b) merely acknowledges that the Act continued the existence of such immunities. We have long recognized the inherent mutability of common law immunities and have not hesitated to abandon or restrict them when as a matter of sound public policy they have outlived their usefulness. *See, e.g., Weinberg v. Dinger,* 106 *N.J.* 469 (1987); *Foldi v. Jeffries,* 93 *N.J.* 533 (1983); *France v. A.P.A. Trans. Corp.,* 56 *N.J.* 500 (1970); *Willis v. Department of Conservation & Economic Dev., supra,* 55 *N.J.* 534; *Collopy v. Newark Eye & Ear Infirmary,* 27 *N.J.* 29 (1958). We have similarly recognized the mutability of common law immunities even when they have been included as common law doctrines in statutory enactments. For example, the Court construed the Married Persons' Act, *N.J.S.A.* 37:2–1 to –30, as incorporating the common law, which then recognized spousal immunity. The Court reasoned, however, that "the statute did not incorporate immunity, but rather the common law with its inherent capacity for change." *Immer v. Risko,* 56 *N.J.* 482, 487 (1970). Similarly, in *Renz v. Penn Central Corp.,* 87 *N.J.* 437 (1981), the Court found that the specific adoption of a contributory negligence bar in the railroad immunity act was intended to incorporate the common law doctrine of contributory negligence. *N.J.S.A.* 48:12–152. Accordingly, it construed the statute as permitting the application of comparative negligence as a matter of common law evolution, which was totally consistent with notions of public policy as evidenced by

the Legislature's separate adoption of comparative negligence. *See Renz, supra,* 87 *N.J.* at 449.

The Tort Claims Act itself contemplates judicial development of the common law immunities it recognizes. The Comment to *N.J.S.A.* 59:2–1(b) provides "it is anticipated that the Courts will realistically interpret both statutory and common law immunities to effectuate their intended scope." Furthermore, the Comment to the public property liability section, *N.J.S.A.* 59:4–1, while citing to *Miehl* and *Amelchenko,* states that "[i]t is anticipated that this section will be developed to the extent possible in accordance with common law principles of landowner liability." Most telling of all is the Comment to the Act's general liability provision, *N.J.S.A.* 59:2–2, which observes that "[w]hile the general approach of this act is immunity unless liability, this section provides a flexible liability provision which will permit the courts to adapt the principles established in this act to the particular circumstances of the cases coming before them." This is consistent with the course the Court took in *Willis v. Department of Conservation & Economic Development, supra,* 55 *N.J.* 534, when it abrogated common law immunity for the State, since the Court there was persuaded to take the action it did in part by the fact that lower courts had been successful in developing common law immunities to protect governments in particular situations. *Willis, supra,* 55 *N.J.* at 539–40. Finally, the Court in *Willis* anticipated such judicial action, noting "[i]t may well be that the subject so defies precise statement that inevitably the controlling concepts must be deireloped case by case even if the legislature does speak." *Id.* at 539.

Thus, the common law immunities that survived the enactment of the Tort Claims Act remain subject to judicial modification, and it would be a mistake to infer a legislative intent to freeze the development of this common law creation. To the extent there are aspects of underlying conduct that as a matter of sound public policy demand some continuing protection, there is no reason why these concerns cannot be accommodated

without necessarily retaining the immunity in its most expansive and absolute form. Thus, the modification or abrogation of immunity may incorporate protective conditions. *See, e.g., Weinberg v. Dinger, supra,* 106 *N.J.* 469 (abrogating immunity of private water companies for fire losses due to inadequate water pressure but refusing to allow subrogation claims brought by fire insurance companies). Further, it does not follow that if an immunity is to be modified or partially abrogated, the underlying duty of care must be equated with negligence. Indeed, if that standard of care is deemed insufficiently protective, it may be heightened to strike a fair balance between the interests of the actor and the victim. The Court in *Foldi v. Jeffries, supra,* 93 *N.J.* 533, for example, partially abrogated parental immunity. In doing so it did not permit liability for parental misconduct that was only negligent; it determined that the duty of care to be imposed would be to refrain from "wanton misconduct." *Id.* at 550.

In this case, if the discretionary determinations relating to snow removal in any respect justify protections even regarding the alleged creation of an unusually dangerous hazard, there is no reason that the Court, as a matter of common law, could not apply an enhanced standard of care, taking into account the legitimate interests of government in encouraging snow removal. Indeed, the "palpably unreasonable" standard of care, if applied in snow removal cases, would mirror the standard adopted by the Legislature under the Act to prescribe the duty owed by public officials, and would be entirely consistent with the intent of the Legislature when it enacted the Tort Claims Act. *Accord Renz v. Penn Central Corp., supra,* 87 *N.J.* at 459.

As the majority recognizes, however, plaintiffs can maintain their suit against the Department of Transportation even absent such judicial development, since the Legislature has explicitly provided for liability in cases such as this under *N.J.S.A.* 59:4–4. According to the Comment to this section, a government entity may be liable if it fails to provide a warning "when

a condition exists constituting a 'trap' to a person using a street or highway with due care." As it has been judicially interpreted, *N.J.S.A.* 59:4–4 requires that the government entity have actual or constructive knowledge of an emergent condition in the road itself that would not be reasonably apparent to a person exercising due care. The provision extends only to emergent conditions; it does not extend to permanent conditions of the road itself, since this would conflict with the immunity provided for failure to provide ordinary traffic signals, *N.J.S.A.* 59:4–5, and, perhaps, the general immunity for plan or design of public property, *N.J.S.A.* 59:4–6. *See, e.g., Kolitch v. Lindedahl,* 193 *N.J.Super.* 540, 546 (App.Div.1984) (no liability for failure to warn of approaching blind curve since *N.J.S.A.* 59:4–4 is inapplicable to ordinary, continuing traffic conditions), rev'd on other grounds, 100 *N.J.* 485 (1985); *Aebi v. Monmouth County Highway Dep't,* 148 *N.J.Super.* 430 (App. Div.1977) (no liability for failing to post sign warning of sudden narrowing of road at a bridge). Furthermore, it is limited to actual road conditions. In *Johnson v. Township of Southampton,* 157 *N.J.Super.* 518 (App.Div.), certif. denied, 77 *N.J.* 485 (1978), recovery was denied to a motorcyclist whose view of an intersection was obscured by vegetation on the side of the road. In rejecting plaintiff's argument that under *N.J.S.A.* 59:4–4 the Township should have posted a sign warning of the intersection, the court stated:

> There is no allegation made by plaintiffs that the roads in question were obstructed or that the right-of-way contained a dangerous condition. The limited ability to make observations on either side of the road caused by trees and vegetation simply served as a warning that due care must be maintained. The road conditions which presented themselves to the plaintiff passenger and his operator did not constitute a "trap."
>
> [*Johnson, supra,* 157 *N.J.Super.* at 523.]

The facts of this case fall squarely within the narrow set of facts anticipated by *N.J.S.A.* 59:4–4. While plaintiffs would have to establish knowledge on the part of the State of the dangerous condition, the fact that the State or its agents created the hazard provides a basis for a finding that the State

had constructive knowledge of the location of the snowbank. Furthermore, it is apparent that a huge mound of snow is an emergent condition rather than a permanent characteristic of the road, and it must be assumed in the context of a motion for summary judgment that the snowbank was obstructing the right of way. Thus, provided that constructive knowledge of the snowbank can be attributed to the State, and the snow mound was in fact in the southbound lane of Rt. 21, plaintiffs should be allowed to recover if they can establish that the snowbank was not reasonably apparent to a person exercising due care, and that the State's failure to post a sign warning of the hazardous condition was palpably unreasonable.

The significance of *N.J.S.A.* 59:4–4 in the context of this case is that it imposes a duty on a governmental entity to warn of a hazardous condition whether or not the government entity was negligent in creating or failing to remedy the dangerous condition. In *Bergen v. Koppenal, supra,* 52 *N.J.* at 480, the common law predecessor of *N.J.S.A.* 59:4–4, this Court noted that a municipality had a duty to warn of a road condition that is likely not to be observed by a motorist and presents an unusual risk of injury even if the municipality was not responsible for creating the dangerous condition. *Accord McGowan v. Borough of Eatontown,* 151 *N.J.Super.* 440 (App.Div.1977) (finding potential liability under *N.J.S.A.* 59:4–4). Even assuming that the Court is as a matter of law correct in holding that under *Miehl* a governmental entity is not negligent under *N.J.S.A.* 59:4–2 for creating a hazardous condition in a public highway in the course of snow removal activities, this does not relieve a government entity of its independent statutory duty under *N.J.S.A.* 59:4–4 to warn of dangerous emergent conditions of a public highway regardless of how such conditions occurred.

### III.

Throughout its opinion, the Court expresses its concern that permitting suits such as plaintiffs' would pose a question of

fact, thus potentially allowing any plaintiff injured by a snow-related condition to survive a motion for summary judgment, thus subjecting governmental entities to the expense of defending a prohibitive number of cases on the merits. I believe such concerns are exaggerated.

First, to the extent that plaintiffs' action would proceed under *N.J.S.A.* 59:4-4, as the Comment to that section illustrates, the statute contemplates only accidents involving the use of a street or highway. Therefore, pedestrian-on-public-property slip-and-fall cases, such as *Amelchenko v. Freehold Borough, supra,* 42 *N.J.* 541, would not come within the scope of *N.J.S.A.* 59:4-4. Furthermore, as interpreted by *Johnson, supra,* 157 *N.J.Super.* 518, *N.J.S.A.* 59:4-4 imposes liability only where a condition of the roadway itself caused the accident. Piles of snow merely obscuring the view of an intersection, *see Paternoster v. N.J. Dep't of Transp.,* 190 *N.J.Super.* 11 (App.Div.) (imposing liability for failing to lower snowbanks obscuring the view of an intersection), certif. denied, 96 *N.J.* 258 (1983), would not give rise to liability under *N.J.S.A.* 59:4-4.

In addition, in many cases, it should be possible to resolve on summary judgment whether or not the hazard was reasonably apparent or should have been anticipated by a person exercising due care. The factual predicate for the immunities established in *Amelchenko* and *Miehl* was that the conditions at issue in those cases were such that the plaintiffs should have anticipated the hazard that caused the injury. Thus, in *Amelchenko* the Court denied recovery to a pedestrian who slipped and fell in an unplowed municipal parking lot, noting that "there are certain risks inherent in the presence of snow on a public way which are obvious to pedestrians and which naturally put them on guard[,]" *Amelchenko, supra,* 42 *N.J.* at 551; and in *Miehl* the Court concluded that persons traveling after a snowstorm assume the normal risks of incomplete snow removal, since "[t]he unusual traveling conditions following a snowfall are obvious to the public." *Miehl, supra,* 53 *N.J.* at 54.

If some hazards are so obvious that this Court has, in effect, been willing to conclude that the plaintiffs have assumed the risk involved, it would appear that there are some conditions about which reasonable minds would not differ as to whether or not they were obvious to a motorist exercising due care. Furthermore, in many cases, the fact that plaintiff observed or was aware of the hazard will be disclosed in the pleadings, as it was in *Amelchenko* and *Miehl.* In cases such as this, defendants should not have to bear the burden of defending their conduct at trial. *Cf. Foldi v. Jeffries, supra,* 93 *N.J.* at 85 (granting summary judgment to parents in cases where conduct alleged did not constitute willful and wanton misconduct). Hence, there is no persuasive basis for concluding that summary judgment will not be an effective procedure in disposing of litigation in this area.

There may be cases where the plaintiffs' pleadings and pre-summary judgment discovery do not resolve the question of whether plaintiff actually saw, or should have seen, the hazard. The reasonableness of the failure to anticipate such a hazard will thus be a question for the finder of fact. Two cases that the Appellate Division has allowed to go to a jury under this theory are *Meta v. Township of Cherry Hill,* 152 *N.J.Super.* 228 (App.Div.), certif. denied, 75 *N.J.* 587 (1977), in which water flowing onto a roadway had frozen and formed an isolated icy patch, and *McGowan v. Borough of Eatontown, supra,* 151 *N.J.Super.* 440 in which water flowing down a driveway formed an isolated ice patch on a state highway. Even in those cases, while plaintiff might survive a motion for summary judgment, he will still have the burden of proving that a reasonable person would not have seen the snow or ice patch or, given the temperature and the recent weather conditions, would not have reasonably anticipated that there would be ice on the road. Once the plaintiff overcomes that hurdle, he would still be faced with establishing that a governmental entity knew or should have known of the hazard (it should be noted that in both *Meta* and *McGowan* the defendant municipalities conceded they were

aware of the hazards). Then and only then is the governmental entity's failure to post a warning sign scrutinized. Even at this stage, a governmental entity is protected from excessive liability by the very high threshold established by the "palpably unreasonable" standard.

Furthermore, to the extent that liability is predicated on the provisions of *N.J.S.A.* 59:4-2 concerning the condition of public property, it must be remembered that the common law immunities recognized in *Amelchenko* and *Miehl* are still in effect and available as a means of resolving the typical snow-related accident claim. Unless the facts as alleged involve hazards different in kind from those discussed by the Court in such cases, lower courts would be justified in grating a governmental entity summary judgment. In effect, the scope of a governmental entity's immunity from liability for snow removal activities would be subject to judicial refinement over time to address the facts presented by particular cases. This, however, is the essence of a common law immunity. *See Willis v. Department of Conservation & Economic Dev., supra,* 55 *N.J.* at 539.

Finally, the floodgate argument itself is more shadow than substance. It was raised when this Court removed interspousal immunity as a defense in automobile accidents in *Immer v. Risko, supra,* 56 *N.J.* at 490, and raised again when we expanded *Immer* to include almost all interspousal torts in *Merenoff v. Merenoff,* 76 *N.J.* 535, 552-53 (1978). In neither case did the predicted floodtide of litigation result. More recently we were unpersuaded by this threat in determining to abrogate the immunity of water utilities for the negligent failure to maintain water pressure. *Weinberg v. Dinger, supra,* 106 *N.J.* at 493. As this Court has observed in the past, "[i]t is, after all, the business of our courts to deal with such problems and we ought not assume that the task is too onerous without some basis in experience for the assumption." *Immer, supra,* 56 *N.J.* at 494. *See also People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 *N.J.* 246, 254 (1985) ("The answer to the allegation of unchecked liability is not the judicial obstruction of a fairly

grounded claim for redress."). Therefore, we should have "confidence in the resilience and versatility of our courts to address the dangers of fraud and collusion, in either their most virulent forms or in their less noxious guises of simple pettiness or overreaching." *Merenoff*, 76 *N.J.* at 556. In light of the narrow scope of liability provided by *N.J.S.A.* 59:4-4, and *N.J.S.A.* 59:4-2, the unlikelihood of the average snow-related accident giving rise to such a suit, and the ability of the judicial system to cope with frivolous claims, the floodgate argument advanced by the Court is unpersuasive.

IV.

The Tort Claims Act itself suggests the way in which this area of the law should be allowed to develop, anticipating that governmental entities' liability for the condition of its property would evolve in accordance with common law principles of landowner liability. *See* Comment to *N.J.S.A.* 59:4-2. In light of this, I feel that on the facts of this case the *Miehl* immunity does not apply, and *N.J.S.A.* 59:4-2 imposes liability on a public entity for injury caused by a condition of its property, subject to a "palpably unreasonable" standard. Moreover, by its own terms *N.J.S.A.* 59:4-4 imposes similar liability for failure to provide emergency signs necessary to warn of a dangerous condition that would not have been reasonably apparent to a person exercising due care. Thus, both the common law and the Tort Claims Act provide for liability under the facts alleged by plaintiffs, and the trial court erred in granting defendant's motion for summary judgment. Therefore, I concur in the result reached by the Court only to the extent that it recognizes plaintiffs' right to maintain suit pursuant to *N.J.S.A.* 59:4-4.

Chief Justice WILENTZ joins in this opinion.

CLIFFORD, Justice, dissenting in part.

Part III of the majority opinion, with its grant of leave to plaintiffs to file an amended complaint, loses me. It is nothing

short of a rescue job, a heroic effort to salvage plaintiffs' case by allowing them to start all over again, by way of amended complaint, a case now four years old arising out of a February 1983 occurrence. The resort to *N.J.S.A.* 59:4-4 is nothing less than an invention of the Court. That section of the Tort Claims Act is nowhere adverted to at any stage of the proceedings— not at trial, not in the Appellate Division, not in this Court. The briefs may be searched in vain for any citation to that statute.

The Court therefore lends its authority to making an entirely new case for plaintiffs. That may be good for them but it is manifestly unfair to defendant Department of Transportation, to say nothing of the trial judge. I do not perceive my obligation to see that justice is done as constituting a roving commission to inject whenever needed a transfusion of life-giving serum into an expired case.

For the reasons stated in Parts I and II of the Court's opinion I would reverse and remand to the Law Division for reinstatement of the judgment in favor of defendant Department of Transportation.

Justices POLLOCK and GARIBALDI join in this opinion.

*For affirmance as to part II* —Chief Justice WILENTZ and Justice HANDLER—2.

*For reversal as to part II* —Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—5.

*For remand and amending complaint as to part III* —Chief Justice WILENTZ and Justices HANDLER, O'HEARN and STEIN—4.

*For remand and reinstatement of judgment as to part III* —Justices CLIFFORD, POLLOCK and GARIBALDI—3.