**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0366-22

RUSSELL FORDE HORNOR,

      Plaintiff-Respondent,

v.

UPPER FREEHOLD REGIONAL
BOARD OF EDUCATION, d/b/a
UPPER FREEHOLD REGIONAL
SCHOOL DISTRICT, and
ALLENTOWN HIGH SCHOOL,

      Defendants-Appellants,

and

NEW JERSEY FUTURE FARMERS
OF AMERICA,

      Defendant-Respondent,

and

ALLENTOWN FUTURE FARMERS
OF AMERICA and CHARLES
HUTLER, III,

      Defendants.

_____

Argued March 1, 2023 – Decided October 8, 2024

Before Judges Accurso, Vernoia and Natali.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-3887-21.

Cherylee O. Melcher argued the cause for appellants (Hill Wallack, LLP, attorneys; Cherylee O. Melcher, on the briefs).

Gabriel C. Magee argued the cause for respondent Russell Forde Hornor (Levy Baldante Finney & Rubenstein, PC, attorneys; Gabriel C. Magee and Mark R. Cohen, on the brief).

Zachary J. Styczynski argued the cause for respondent New Jersey Future Farmers of America (Davison, Eastman, Muñoz, Paone, PA, attorneys; Zachary J. Styczynski, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

The Upper Freehold Regional Board of Education appeals on our leave from the trial court's denial of its motion to dismiss those counts of plaintiff Russell Forde Hornor's complaint asserting claims for breach of fiduciary duty and vicarious liability arising out of his alleged sexual abuse at age fifteen by his former teacher Charles Hutler. We reverse. New Jersey does not recognize a fiduciary duty in teachers, school administrators and boards of

A-0366-22

education to their students, and the 2019 amendments to the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, do not make the Board vicariously liable under N.J.S.A. 59:2-2(a) for the sexual assault Hornor concedes was outside the scope of Hutler's employment.

In November 2021, Hornor, then fifty-eight-years-old, filed a seven-count complaint against the Board, New Jersey Future Farmers of America, Allentown Future Farmers of America, Hutler's estate and both individual and institutional fictitious defendants alleging Hutler, Hornor's freshman science teacher in 1978-79, sexually abused him.

Specifically, Hornor claims Hutler, who was also the chapter adviser and team coach for the Allentown Chapter of New Jersey Future Farmers of America, in which Hornor was enrolled by virtue of his participation in his school's agricultural science program, assisted him with daily transportation to his after-school job at a local nursery, and further gained his trust and friendship by taking him to Future Farmers of America basketball games and events. Hutler would also take Hornor, who describes himself as having had "a troubled and dysfunctional home life," bowling and to the movies with two of Hornor's friends. Hornor claims that after those outings, Hutler, who died in 2011, would buy the boys alcohol and drink with them.

After a Future Farmers of America plant and landscaping competition at Rutgers in April 1979, in which Hornor had placed fourth, Hutler took Hornor and his friends out to celebrate, driving them to a liquor store and purchasing wine for the group. After taking the other boys home, Hutler drove Hornor to Hutler's apartment on a ruse, where he sexually assaulted him. Hutler instructed Hornor not to tell anyone about the assault as no one would believe him. Hornor believes Hutler sexually abused him in other ways or on other occasions, and abused other boys as well, but is convinced he has emotionally suppressed additional details or episodes of abuse.

Hornor's complaint, as to the Board, contained counts alleging negligence, negligent supervision, negligent hiring and retention, gross negligence, intentional infliction of emotional distress, breach of fiduciary duty, a sexually hostile environment under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50, and his entitlement to punitive damages. The Board promptly moved to dismiss, with prejudice, the counts for breach of fiduciary duty, punitive damages and any claims asserting

A-0366-22

vicarious liability for Hutler's sexual abuse of plaintiff pursuant to <u>Rule</u> 4:6-2(e) for failure to state a claim upon which relief can be granted.[1]

Hornor opposed the motion, and after extensive briefing and oral argument, the court denied it and endorsed the parties' agreement to permit Hornor to file an amended complaint removing the count for punitive damages. The trial court acknowledged Hornor's claim that Hutler and the Board owed him a fiduciary duty is not one recognized in New Jersey. It, nevertheless, found such a duty by extending the Supreme Court's holding in <u>F.G. v. MacDonell</u>, 150 N.J. 550, 556 (1997), where the Court recognized a fiduciary duty in a clergyman to a parishioner to whom the clergyman is providing pastoral counseling, to Hutler's "successful campaign to earn" Hornor's "trust and confidence," which "extended beyond the [school] bell" and ultimately resulted in his sexual abuse.[2]

---

[1]  The Board also unsuccessfully moved to dismiss the count for intentional infliction of emotional distress. It did not, however, move for reconsideration or leave to appeal that ruling, and thus we do not consider it here.

[2]  The court held

> <u>F.G.</u>'s themes of trust, confidence in another, and vulnerability apply with equal force to the school setting such that an extension of <u>F.G.</u>'s holding to an educator is an appropriate, common sense, and modest

A-0366-22

As to Hornor's claim for vicarious liability, the court held that after the 2019 amendments to the Tort Claims Act, "a public entity, such as the Board, may be vicariously liable for the sexual abuse inflicted by its employee's willful, wanton, or grossly negligent act occurring within the scope of his or her employment."  See N.J.S.A. 59:2-1.3(a)(1); E.C. by D.C. v. Inglima-Donaldson, 470 N.J. Super. 41, 56 (App. Div. 2021).

Hornor acknowledges Hutler's abuse of him was outside the scope of Hutler's employment.  But the trial court relied on Hardwicke v. American Boychoir School, 188 N.J. 69, 101-02 (2006) — in which the Supreme Court held a private boarding school could be held liable as a passive abuser under the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1(a)(1), allowing Hardwicke to also pursue his related common law claims based on willful, wanton or negligent conduct falling within the Act's definition of sexual abuse committed by a school administrator acting outside the scope of his employment under section 219(2)(d) of the Restatement (Second) of Agency (Am. Law Inst. 1958), when the school had delegated specific authority to the abuser and the

---

extension of the common law where the educator takes affirmative steps beyond the classroom, as Hutler did here, to earn a child's trust and provide counseling beyond mere reading, writing, and arithmetic.

delegation aided him in committing the sexual abuse — to find the Board could be held vicariously liable for Hutler's sexual abuse of Hornor.

The Board moved for reconsideration, which the court granted, in part. The court struck all claims for punitive damages but for those arising from the Board's alleged violation of the Law Against Discrimination and denied reconsideration with respect to its rulings on fiduciary duty and vicarious liability. We granted the Board's motion for leave to appeal the court's rulings on those two claims.

We review a trial court's decision on a motion to dismiss a complaint for failure to state a claim under Rule 4:6-2(e) using the same standard as applied in that court. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989). Our review is de novo, and we owe no deference to legal conclusions we deem mistaken. Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, P.C., 237 N.J. 91, 108 (2019). The same is true of our review of the trial court's interpretation of statutes. Aronberg v. Tolbert, 207 N.J. 587, 597 (2011). "Because the appeal arises on defendants' motion for judgment on the pleadings[,] . . . we assume the truth of the allegations of the complaint, giving plaintiff the benefit of all reasonable factual inferences that those allegations support." F.G., 150 N.J. at 556.

<u>Plaintiff's claim of breach of fiduciary duty</u>

The Board claims the trial court ignored controlling Supreme Court precedent defining the duty owed by public school teachers, administrators and boards of education to their students and overread and misapplied <u>F.G.</u> in creating a new fiduciary duty in the Board to students in the district. Specifically, the Board argues the pastoral counseling relationship between the priest and his parishioner in <u>F.G.</u> bears no resemblance to Hutler taking Hornor to basketball games and helping him get to an afterschool job, even if Hornor regarded Hutler as a mentor. It also notes Hornor failed to plead any similar allegations of a confidential relationship between Hornor and the Board.

The Board contends Hornor's complaint includes only conclusory allegations that the Board breached its "fiduciary duties to avoid harming children and to protect them from harm at the hands of [its] employees" in the same manner he claims it breached its duties in the negligence counts, all of which resulted in the same harm, making the fiduciary duty claim simply duplicative of recognized tort duties already pled. Finally, the Board argues "[a] fiduciary relationship between [a] K-12 school and its personnel and their students is contrary to both the duty of undivided loyalty owed by fiduciaries

8

to their beneficiaries and the prohibition on conflicts of interest that govern fiduciaries' conduct."

Hornor counters that he is not contending "all student-teacher relationships result in a fiduciary duty" only those in which a teacher, like Hutler, uses a "grooming process" to create a confidential relationship of dominance over a student like Hornor, which confidential relationship he claims "establishes a fiduciary duty." Hornor claims the Court "already recognized [in F.G.] that the creation of the type of 'special relationship' alleged here creates a fiduciary duty, albeit in a somewhat different, but analogous, context." Hornor contends Hutler's "'grooming activities' created a narrowly tailored fiduciary duty" to him, and the 2019 amendments to the Tort Claims Act allow Hornor to recover for the Board's breach of that duty. We disagree.

F.G., is a First Amendment case in which the Supreme Court reversed our decision recognizing a cause of action for clergy malpractice arising out of a priest's sexual misconduct with a parishioner. F.G. v. MacDonell, 291 N.J. Super. 262, 265-66 (App. Div. 1996), aff'd in part, rev'd in part, 150 N.J. 550 (1997). F.G. had consulted the rector of her parish, MacDonell, for pastoral counseling. 150 N.J. at 556. "Aware that F.G. was vulnerable, MacDonell

nonetheless induced her to engage in a sexual relationship with him." Ibid. F.G. subsequently sued MacDonell for clergy malpractice, along with negligent infliction of emotional distress and breach of fiduciary duty, alleging he "'engaged in sexual behavior with [her] inappropriate to and in violation of [the special relationship]' he owed her, and that 'he failed to exercise the degree of skill, care and diligence which is exercised by the average qualified pastoral counselor provider.'" Id. at 556-57 (alterations in original).

Although the Court determined F.G. could state a claim against MacDonell, it declined to find a cause of action for clergy malpractice. Id. at 561. Writing for the Court, Justice Pollock explained that defining the standard of care in a clergy malpractice case "could embroil courts in establishing the training, skill, and standards applicable for members of the clergy in a diversity of religions with widely varying beliefs," and "require courts to identify the beliefs and practices of the relevant religion and then to determine whether the clergyman had acted in accordance with them," resulting in the very real risk of "restrain[ing] the free exercise of religion." Id. at 562-63.

The Court determined it could avoid that entanglement with religion by casting the cause of action as one for breach of fiduciary duty instead. Id. at

10

558.  It explained a fiduciary relationship, the essence of which "is that one party places trust and confidence in another who is in a dominant or superior position[,] . . . arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  Id. at 563.  The Court found that "[t]rust and confidence are vital to the counseling relationship between parishioner and pastor," and that "[b]y accepting a parishioner for counseling, a pastor also accepts the responsibility of a fiduciary."  Id. at 564.

Most important for First Amendment purposes, "an action for breach of fiduciary duty," unlike an action for clergy malpractice, "does not require establishing a standard of care and its breach.  Establishing a fiduciary duty essentially requires proof that a parishioner trusted and sought counseling from the pastor.  A violation of that trust constitutes a breach of the duty."  Id. at 565.  By declaring a cleric to have a fiduciary duty to a parishioner he has accepted into pastoral counseling, the Court provided the parishioner an avenue to recover monetary damages for the violation of her trust without "running the risk of entanglement with the free exercise of religion" by defining the duties of a member of the clergy to a parishioner and adjudicating their alleged breach in our courts.  Id. at 558.

A-0366-22

In our view, F.G. provides no support for recognizing a fiduciary duty on the part of a board of education to a student in the district. Defining the duty of a board of education to its students does not entangle the courts in the free exercise of religion. Moreover, F.G. did not involve a claim against the church, nor any claim outside the narrow confines of a voluntary pastoral counseling relationship between a priest and his parishioner. It provides no guidance as to how such a claim could be brought against an entity defendant, like the school district with whom plaintiff admittedly did not have a confidential relationship. In addition, assigning a fiduciary duty running to a specific student from an entity like the Board, that owes obligations to multiple stakeholders involved in educating the district's children, often with conflicting interests, is incompatible with the duty's defining characteristic of undivided loyalty to a particular person or interest. See Bankers Trust Co. v. Bacot, 6 N.J. 426, 436 (1951) (noting "undivided loyalty is of the very essence of a trust relationship"). Cf. McDonough v. Roach, 35 N.J. 153, 159 (1961) (explaining danger of dual office holding that "invite[s] a clash of the obligations each unit of government owes to its respective citizens").

Even more troubling to us, however, is the trial court's adoption of plaintiff's argument that it was Hutler's alleged "grooming" of Hornor that

12

created the "special relationship" giving rise to Hutler's fiduciary duty to

Hornor.[3]  In <u>McKelvey v. Pierce</u>, another clergy case, the Court explained

"[t]he fiduciary's obligations to the dependent party," there a seminarian,

"include a duty of loyalty and a duty to exercise reasonable skill and care" in

acting or giving advice within the scope of the relationship, and that "the

fiduciary is liable for harm resulting from a breach of the duties imposed by

---

[3]  Hornor relies on a definition of grooming in an article by Daniel Pollack and Andrea MacIver, <u>Understanding Sexual Abuse in Child Abuse Cases</u>, <u>Child L. Prac. Today</u>, Nov. 2015 (citing U.S. Department of Justice, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) Program), which describes it as:

> a method used by offenders that involves building trust with a child and the adults around a child in an effort to gain access to and time alone with her/him. In extreme cases, offenders may use threats and physical force to sexually assault or abuse a child. More common, though, are subtle approaches designed to build relationships with families.
>
> The offender may assume a caring role, befriend the child or even exploit their position of trust and authority to groom the child and/or the child's family. These individuals intentionally build relationships with the adults around a child or seek out a child who is less supervised by adults in her/his life.  This increases the likelihood that the offender's time with the child is welcomed and encouraged.

A-0366-22

the existence of such a relationship." 173 N.J. 26, 57 (2002), holding modified

by Hyman v. Rosenbaum Yeshiva of N. Jersey, 258 N.J. 208 (2024).

Here, the alleged harm did not arise out of Hutler's breach of the duties

of loyalty and reasonable skill and care in acting or giving advice within the

scope of a defined relationship with Hornor, the harm was in the nature and

scope of the relationship itself. The trial court was clear that, in its view, not

every teacher owes a fiduciary duty to his students, but only those teachers

grooming students for sexual abuse.[4] Grooming a student for sexual abuse is

_____

[4] Specifically, the court stated

> Although it is undisputed that courts across the nation
> at various levels have not reached a consensus, this
> court concludes that a fiduciary duty exists to protect a
> student from sexual abuse where, as here, a
> confidential relationship involving the repose of trust
> by a student in an educator exists based on the close
> relationship between victim and alleged abuser that
> extended beyond mere classroom instruction.

The court went on to explain, however, that "[s]uch is not to say that a broader
fiduciary duty exists nor is imposed on all educators in all circumstances to all
students." Thus, the court took "no position" on whether other teachers might
also have fiduciary duties to their students "outside the context of an alleged
sexual abuse."

The duty the trial court adopted is unacceptably vague, being identifiable, it
would appear, only on its breach. The court took pains to note it's not every
teacher who mentors a student outside the classroom who will be held to have

14

not remotely akin to the voluntary counseling relationship between pastor and parishioner in F.G.  We cannot imagine the fiduciary duty the Court found to inhere in a pastoral counseling relationship could appropriately be extended to "Hutler's successful campaign" to earn Hornor's trust and confidence by "a pattern of long-term, methodical grooming."[5]  The concepts are antithetical to one another.

Most important, there was no need for the trial court to have wrestled with the question of the Board's duty to Hornor.  The Court defined that duty

---

accepted a fiduciary duty toward that student, but only those found liable for sexual abuse.  The test for the existence of a duty, however, "is not retrospective but prospective."  Mayer v. Hous. Auth. of City of Jersey City, 44 N.J. 567, 573 (1965) (Haneman, J. dissenting).  "Fairness ordinarily requires that a man be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it."  Davis v. Devereux Found., 209 N.J. 269, 297 (2012) (quoting Goldberg v. Hous. Auth. of City of Newark, 38 N.J. 578, 589 (1962)).

[5]  We also question the wisdom of stretching "to create a new tort to provide a remedy for conduct that was already tortious," that is, the sexual abuse of a student, and for which relief is otherwise provided by the Act.  See F.G., 150 N.J. at 570 (O'Hern, J. dissenting).  See 1972 Task Force Comment to N.J.S.A. 59:2-1 (recommending "restraint in the acceptance of novel causes of action against public entities").  See also Rochinsky v. State, Dep't of Transp., 110 N.J. 399, 407 n.4 (1988) ("The Comments following certain sections of the statute were taken from the Report of the Attorney General's Task Force on Sovereign Immunity — 1972, and accompanied the Act during its consideration by the Legislature.  They have the precedential weight and value of legislative history.").

in the context of the sexual abuse of students over twenty years ago in <u>Frugis</u> <u>v. Bracigliano</u>, 177 N.J. 250, 257 (2003), a case involving an elementary school principal who photographed male students in his office in "provocative poses," for his own sexual gratification.[6]  The Court held that "[s]chool personnel owe a duty to exercise reasonable care for the safety of students entrusted to them," which "extends to supervisory care required for the student's safety or well-being as well as to the reasonable care for the student at school-sponsored activities in which the student participates."  <u>Id.</u> at 270. The Court defined the standard of care as "that degree of care which a person of ordinary prudence, charged with comparable duties, would exercise under the circumstances," and held "[t]he duty may be violated by not only the commission of acts but also in the neglect or failure to act."  <u>Ibid.</u>  That

---

[6]  The same duty in school personnel was recognized in other contexts long before <u>Frugis</u>.  <u>See</u> <u>Titus v. Lindberg</u>, 49 N.J. 66, 73 (1967) ("The duty of school personnel to exercise reasonable supervisory care for the safety of students entrusted to them, and their accountability for injuries resulting from failure to discharge that duty, are well-recognized in our State and elsewhere.").

A-0366-22

standard is reflected in <u>Model Jury Charges (Civil)</u>, 5.74, "Duty of Teachers and School Personnel to Student" (approved Sept. 1980).[7]

As Justice Albin explained for the Court in <u>Frugis</u>:

> The law imposes a duty on children to attend school and on parents to relinquish their supervisory role over their children to teachers and administrators during school hours. While their children are educated during the day, parents transfer to school officials the power to act as the guardians of those young wards. No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others. Although the overarching mission of a board of education is to educate, its first imperative must be to do no harm to the children in its care. A board of education must take reasonable measures to assure that the teachers and administrators who stand as surrogate parents during the day are

_____

[7] The Court in <u>Frugis</u> also detailed the instructions the trial judge is to provide the jury in apportioning liability between the abuser and the board — after it has decided all questions of liability and damages — including "the heightened duty of school boards to ensure students' safety from foreseeable harms, particularly those presented by the intentional acts of school personnel." 177 N.J. at 282. The Court required that a jury be instructed in a "two-phase procedure" that its "apportionment of liability should reflect the extent to which the school board's failure to discharge its duties exposed the students in its care to intentional misconduct by one of its employees" and that its apportionment "should not diminish the school board's overriding duty to protect students from foreseeable intentional torts by school personnel." <u>Id.</u> at 282-83.

educating, not endangering, and protecting, not exploiting, vulnerable children.[8]

[177 N.J. at 268.]

The Court has since reaffirmed its consistent application of "traditional principles of due care and foreseeability to cases involving in loco parentis relationships, rather than adopting a 'non-delegable' or absolute duty" in such cases — which is obviously closely akin to, if not the same as, the fiduciary duty the trial court adopted here.  Davis v. Devereux Found., 209 N.J. 269, 289, 291-92 (2012) (noting "[t]he liability of in loco parentis institutions [is] determined in accordance with traditional negligence principles; the 'non-delegable' duty proposed here, amounting to an employer's absolute liability for an employee's criminal act, has not been accepted by [the Supreme] Court in any setting similar to that of this case").  Indeed, the Court in Davis noted that "Frugis . . . confirms that the in loco parentis institution is held to a duty of due care."  Id. at 290.  Given the Court's unwavering consistency over several decades in defining the duty of in loco parentis institutions,

---

8  The trial court quoted this same passage from Frugis, but drew from it not that boards of education have a duty to exercise reasonable care for the safety of students but a heightened, more exacting duty, "something stricter," "the punctilio of an honor the most sensitive," Justice (then Chief Judge) Cardozo's oft-quoted definition of fiduciary duty for the New York Court of Appeals in Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928).

A-0366-22

specifically including public boards of education, as one of due care, the trial court erred in recognizing any different duty in the Board to Hornor.

Plaintiff's claim for vicarious liability

The Board asserts the aided-by-agency theory urged by Hornor and adopted by the trial court does not assist Hornor here because the 2019 amendments to the Tort Claims Act did not alter N.J.S.A. 59:2-2, which establishes public entity liability for only those injuries "proximately caused by an act or omission" of the entity's employee acting "within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." The Board asserts N.J.S.A. 59:2-2 is based on the doctrine of respondeat superior under which "the plaintiff must prove the existence of an employer-employee relationship and that the employee's tortious actions 'occurred within the scope of that employment'" for liability to attach to the employer. G.A.-H. v. K.G.G., 238 N.J. 401, 415 (2019) (quoting Carter v. Reynolds, 175 N.J. 402, 408-09 (2003)). Because Hornor concedes Hutler's sexual abuse was outside the scope of his employment, the Board contends Hornor cannot establish the Board's vicarious liability for the assault.

Hornor argues the Board ignores "the sea change in the law" wrought by the 2019 amendments to the Tort Claims Act, which he contends allow the

19

Board to "be both vicariously liable for the sexual abuse committed by its employees and directly liable for its own negligent hiring, retention, and supervision of employees who commit such abuse."[9]

Specifically, Hornor contends the Legislature "explicitly made a public entity's liability for the sexual abuse of a child the same as that of a charitable entity," as demonstrated by the Governor's statement on signing the initial May 2019 version of N.J.S.A. 59:2-1.3(a), in which he explained he was "signing the bill based on a commitment from the bill's sponsors to introduce and swiftly pass a bill" to "clarify[] that public entities should be held to the same standard of liability that is applied to religious and nonprofit organizations." Governor's Signing Statement to S. 477 (May 13, 2019).

Hornor contends the final version of N.J.S.A. 59:2-1.3(a)(1) effective December 1, 2019, disabled the immunities afforded public entities under

_____

[9] The Board concedes it can be sued directly for its alleged negligent hiring, retention and supervision of Hutler based on acts he committed both in and beyond the scope of his employment. See Di Cosala v. Kay, 91 N.J. 159, 170-74 (1982) (expressly recognizing "the tort of negligent hiring or retention of an incompetent, unfit or dangerous employee," and holding "the employee conduct which may form the basis of the cause of action need not be within the scope of employment"); N.J.S.A. 59:2-1.3(a)(2). The Board did not move to dismiss the counts of Hornor's complaint alleging its direct negligence — beyond its successful motion to strike the claim for punitive damages pursuant to N.J.S.A. 59:9-2(c).

N.J.S.A. 59:2-10 for damages resulting from sexual offenses caused by the willful, wanton or grossly negligent acts of their employees, resulting in the Board being subject to vicarious liability for Hutler's acts of sexual abuse outside the scope of his employment to the same extent as the defendant boarding school in Hardwicke under the aided-by-agency principle of Restatement (Second) of Agency § 219(2)(d).

Resolution of the parties' dispute requires an understanding of the scope of a public entity's liability for the acts of its employees under the Tort Claims Act prior to the 2019 amendments, and the effect of the amendments on Hornor's claims.

The Tort Claims Act

The New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, is a complicated statute. Enacted in 1972 in twelve chapters after extended study in response to the Court's abrogation of the State's sovereign immunity to tort claims in Willis v. Department of Conservation and Economic Development, 55 N.J. 534 (1970), it reestablished "sovereign immunity in a manner consistent with the proposals contained in the 1972 Attorney General's Task Force Report." Velez v. City of Jersey City, 180 N.J. 284, 289 (2004). N.J.S.A. 59:1-2 declares it to be

A-0366-22

the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carry out the above legislative declaration.

The essential structure of the statute and its analytic approach to liability and immunity — the warp and weft of the Act — is set out in N.J.S.A. 59:2-1:

a. Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.

b. Any liability of a public entity established by this act is subject to any immunity of the public entity and is subject to any defenses that would be available to the public entity if it were a private person.

The Task Force Comment to Subsection (a) explains the choice of a statute that reimposed sovereign immunity unless liability is specified over a statute imposing liability with specified exceptions. Quoting the California Law Revision Commission, which led to the California Tort Claims Act of 1963 on which our Act is modeled, the Task Force explained "[a] statute imposing liability with specified exceptions . . . would invite actions brought in hopes of imposing liability on theories not yet tested in the courts and could result in greatly expanding the amount of litigation and the attendant expense which public entities would face." N.J.S.A. 59:2-1 Task Force Comment.

22

Thus, in analyzing a tort claim against a public entity in New Jersey, the first task is always to locate the predicate for liability in the Act. Troth v. State, 117 N.J. 258, 277 (1989) (O'Hern J., concurring). If there is no predicate for liability, the inquiry is at an end. "[P]ublic entities are immune from liability unless they are declared to be liable" by a provision of the Tort Claims Act.[10] N.J.S.A. 59:2-1 Task Force Comment.

If there is a statutory predicate for liability under the Act, N.J.S.A. 59:2-1(b) provides it will be subject to any immunity the public entity has under the Act, and otherwise, and to any defense available to a private person. Thus, "[e]ven when one of the Act's provisions establishes liability, that liability is ordinarily negated if the public entity possesses a corresponding immunity." Rochinsky v. State, Dep't of Transp., 110 N.J. 399, 408 (1988).

N.J.S.A. 59:2-1(b) "establishes the principle that even common-law and statutory immunities not contained in the Act can prevail over the Act's liability provisions." Id. at 409. "The statutory scheme recognizes that immunity from tort liability is a species of affirmative defense, which can

---

[10] The rule is opposite for public employees. "A public entity is deemed 'not liable for an injury' except as provided in the Act," N.J.S.A. 59:2-1, whereas "a public employee 'is liable for injury' except as otherwise provided" in the Act, N.J.S.A. 59:3-1. Chatman v. Hall, 128 N.J. 394, 402 (1992).

excuse responsibility for tort without negating the existence of fault." Kolitch v. Lindedahl, 100 N.J. 485, 502 (1985) (Handler J., dissenting). Justice Handler succinctly explained that a plaintiff bringing a negligence action against a public entity "must first establish the predicates for liability, and later avoid application of any provision granting the sovereign immunity." Ibid.

Although these basic principles are easy enough to grasp, explaining their application is not always so straightforward. Part of the problem is we often don't distinguish between situations in which the public entity is immune because there is no predicate for liability in the Tort Claims Act and those in which there is a liability predicate in the Act, but the entity has immunity, that is "absolution from liability," based on some other provision of the Act, or some other statute or the common law. Merenoff v. Merenoff, 76 N.J. 535, 547 (1978) (quoting Prosser, Law of Torts 970 (4th ed. 1971)). The best example is the phrase most often repeated in Tort Claims cases, that is, the "guiding principle" that governmental "immunity from tort liability is the general rule and liability is the exception." Polzo v. Cnty. of Essex, (Polzo I) 196 N.J. 569, 578 (2008) (quoting Coyne v. State Dep't of Transp., 182 N.J. 481, 488 (2005) (quoting Garrison v. Twp. of Middletown, 154 N.J. 282, 286 (1998))). Although undoubtedly true, it doesn't train the mind to identify and

24

differentiate between the liability and immunity provisions of a complicated

statute.[11]

---

[11] We would not be the first to acknowledge it is not always a simple matter to distinguish a liability predicate in the Tort Claims Act from an immunity. Although some provisions, like the plan or design immunity provided by N.J.S.A. 59:4-6 are unambiguously clear immunities for which the public entity bears the burden of proof, if not specific pleading, although that is certainly the better practice, see Rivera v. Gerner, 89 N.J. 526, 535 (1982), others, like N.J.S.A. 59:9-2(d), the $3,600 medical expense and permanency thresholds for pain and suffering damages, are harder to characterize.

The difficulty in distinguishing certain provisions of the Act as liability predicates or immunities is that they can be fairly characterized as defenses "going to the cause of action," which Judge Pressler described as "a hybrid species of legal fact which is defensive in that it is ordinarily defendant's rather than plaintiff's burden to plead, but elemental in that defendant's failure to do so will not bar his right to raise it and thus to defeat the action at any time during the litigation." Montag v. Bergen Bluestone Co., 145 N.J. Super. 140, 148 (Law. Div. 1976). See also Pressler & Verniero, Current N.J. Court Rules, cmt. 1.2.2 on R. 4:5-4 (2024) (noting an affirmative defense need not "be specially pleaded where the defense appears on the face of the complaint and clearly goes to the maintainability of the action").

Notwithstanding our analytical commitment to distinguishing between liability predicates and immunity provisions in the Tort Claims Act, the law being well-settled that "[w]hen both liability and immunity appear to exist, the latter trumps the former," Tice v. Cramer, 133 N.J. 347, 356 (1993), it is rare that a case turns on the distinction as this one does. See Rivera, 89 N.J. at 535 (noting the "little profit" to be had "from an extended analysis of the extent of a public entity's burden to plead and prove its affirmative defense of immunity [under N.J.S.A. 59:9-2(d)] or whether, as has been suggested in other fields of limited liability, the plaintiff bears the continuing burden of overcoming each and every limitation of a cause of action") (citations omitted).

Our Supreme Court has noted "[t]here are three principal liability sections in the Act":  N.J.S.A. 59:2-2, incorporating the doctrine of respondeat superior; N.J.S.A. 59:2-3, addressing discretionary activities and including "both immunity and liability provisions"; and N.J.S.A. 59:4-2, providing liability for dangerous conditions of public property, Rochinsky, 110 N.J. at 409-10 — although there are certainly others tucked throughout the Act, see, e.g., N.J.S.A. 59:4-4 (establishing liability for failure to provide emergency signals on a street or highway); N.J.S.A. 59:9-2(a), (b) and (c) (barring pre-judgment interest, judgments based on strict liability, and punitive damages, respectively); N.J.S.A. 59:8-3(a) (barring suit against a public entity when a notice of claim has not been filed in accordance with the Act).  See also Jones v. Morey's Pier, Inc., 230 N.J. 142, 157 (2017) (holding that "excluding contribution and indemnification claims from the tort claims notice

Of course, the failure to meet the medical expense and permanency thresholds of N.J.S.A. 59:9-2(d) "in no way affects the maintainability of the action itself. It only limits the permissible extent of the recovery by eliminating one of the customary elements of common-law personal injury damages."  Beauchamp v. Amedio, 164 N.J. 111, 119-20 (2000) (quoting Montag, 145 N.J. Super. at 149).  It is thus not a "liability" predicate in the same way as N.J.S.A. 59:2-2, the Act's vicarious liability provision.  See also C.W. v. Roselle Bd. of Educ., 474 N.J. Super. 644, 654 (App. Div.), leave to appeal den., 254 N.J. 172 (2023) (holding the Legislature did not eliminate the $3,600 medical expense threshold in N.J.S.A. 59:9-2(d) in suits against public entities for child sexual abuse under the 2019 amendments).

requirement would contravene the public policy stated by the Legislature . . . [that] 'public entities shall only be liable for their negligence within the limitations of this act'" (quoting N.J.S.A. 59:1-2)).

The scope of the liability predicates differs significantly, with some, like N.J.S.A. 59:2-2(a), establishing "sweeping vicarious liability" for public entities for the acts of their employees, Margolis and Novack, Title 59: Claims against Public Entities, cmt. 1 on N.J.S.A. 59:2-2 (2024), and others, like N.J.S.A. 59:4-2 "impos[ing] specific conditions" on a public entity's liability for the dangerous condition of its property, thus tightly circumscribing the liability the Act concedes, O'Connell v. State, 171 N.J. 484, 501 (2002) (Stein J., dissenting).

"The primary source of public entity liability" is, of course, contained in N.J.S.A. 59:2-2(a), providing "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A. 59:2-2 Task Force Comment. The section "establishes the principle of vicarious liability for all public entities." Ibid. Thus, "[t]he primary liability imposed on public entities is that of respondeat superior: when the public employee is liable for acts within the scope of that

27

employee's employment, so too is the entity; conversely, when the public employee is not liable, neither is the entity." Tice v. Cramer, 133 N.J. 347, 355 (1993) (citing N.J.S.A. 59:2-2). A public entity has no vicarious liability for acts of its employees outside the scope of employment. N.J.S.A. 59:2-2(a); Cosgrove v. Lawrence, 214 N.J. Super. 670, 680 (Law. Div. 1986) (explaining "once a determination is made that the act is not within the scope of employment," the focus of the action shifts from vicarious liability to consideration of whether the employer could be held directly liable for its negligent hiring and supervision), aff'd, 215 N.J. Super. 561 (App. Div. 1987).

Hornor concedes that Hutler's sexual abuse was outside the scope of his employment. Because N.J.S.A. 59:2-2 makes a public employer, like the Board, vicariously liable for the acts of an employee, like Hutler, only when the employee is acting within the scope of his employment, Hornor cannot establish a statutory predicate for the Board's vicarious liability for Hutler's acts. Although the absence of a liability predicate would ordinarily end our inquiry, Hornor contends the 2019 amendments to the Tort Claims Act provide him a basis for vicarious liability against the Board. We thus turn to those amendments.

The 2019 amendments to the Tort Claims Act

The 2019 amendments to the Tort Claims Act were part of the Child Victims Act, L. 2019, c. 120, L. 2019, c. 239, expansive legislation intended to greatly extend the statutes of limitations for claims of sexual abuse for both child and adult victims, create a two-year window for victims to bring claims time-barred even under the newly extended statutes, and expand the categories of potential defendants in such actions, "and for some actions permit retroactive application of standards of liability to past acts of abuse for which liability did not previously exist." S. Judiciary Comm. Statement to S. 477 (Mar. 7, 2019). In addition to creating new statutes of limitations, Chapter 120 amended the Tort Claims Act, the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1, and the Charitable Immunity Act, N.J.S.A. 2A:53A-7 to -11.

As to the Tort Claims Act, Chapter 120 extended the statute of limitations for claims against public entities for sexual assault or abuse in accord with the newly enacted statute of limitations for sexual abuse claims, N.J.S.A. 2A:14-2a and -2b, and abrogated the notice and filing requirements in Chapter 8 for such claims. See W.S. v. Hildreth, 252 N.J. 506, 512-14 (2023) (explaining the effect of the extended statute of limitations and the abrogation

of procedural requirements for claims of sexual abuse filed against a public entity on or after December 1, 2019).

The parties' focus, and ours, is on N.J.S.A. 59:2-1.3, a new section inserted into the Tort Claims Act entitled "Liability for public entity, employee," adopted by Chapter 120 and amended by L. 2019, c. 239, both effective December 1, 2019. As presented for the Governor's signature, Chapter 120, the Senate Committee Substitute for Senate bill 477, section 7 provided:

> 7. (New section) Notwithstanding any other provision of law to the contrary, including but not limited to the "New Jersey Tort Claims Act," N.J.S.59:1-1 et seq., a public entity is liable in an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c. 7 [N.J.S.A. 2A:30B-2], or sexual abuse as defined in section 1 of P.L.1992, c. 109 [N.J.S.A. 2A:61B-1].

The Committee Statement explained the purpose of section 7 was to eliminate public entity immunity for sexual abuse claims.

> This section provides that the "New Jersey Tort Claims Act," N.J.S.59:1-1 et seq., or any other law, that may provide some form of governmental immunity from lawsuits based on injuries resulting from acts of sexual abuse are inapplicable, so that any public entity, as defined in the "New Jersey Tort Claims Act," may be held liable in any such suit in the same manner as a private organization.

[S. Judiciary Comm. Statement to S. 477.]

Governor Murphy signed the bill into law on May 13, 2019. In his signing statement, however, he explained he was

> signing the bill based on a commitment from the bill's sponsors to introduce and swiftly pass a bill that will correct an error in the section of the bill relating to the liability of public entities. This section inadvertently fails to establish a standard of proof for cases involving claims filed against public entities. If unaddressed, the lack of clarity would create uncertainty and likely lead to additional litigation. I have received assurances that the Legislature will correct this omission by clarifying that public entities should be held to the same standard of liability that is applied to religious and nonprofit organizations. Applying a different standard would be unjustified.
>
> [Governor's Statement to S. Comm. Substitute for S. 477 (May 13, 2019).]

The Legislature, as promised, amended section 7 of Chapter 120, by passing Chapter 239, as amended by the Assembly Budget Committee, (now codified as N.J.S.A. 59:2-1.3), providing as follows with new language underlined and omitted language struck through:

> 1. Section 7 of P.L.2019, c. 120 [N.J.S.A.59:2-1.3] is amended to read as follows:
>
> 7. a. Notwithstanding any ~~other~~ provision of ~~law to the contrary, including but not limited to~~ the "New Jersey Tort Claims Act," N.J.S.59:1-1 et seq., to the contrary:

31

(1) immunity from civil liability granted by that act to a public entity ~~is liable in an action at law for an injury resulting from the commission of~~ or public employee shall not apply to an action at law for damages as a result of a sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c. 7 [N.J.S.A. 2A:30B-2], or sexual abuse as defined in section 1 of P.L.1992, c. 109 [N.J.S.A. 2A:61B-1] being committed against a person, which was caused by a willful, wanton or grossly negligent act of the public entity or public employee; and

(2) immunity from civil liability granted by that act to a public entity shall not apply to an action at law for damages as a result of a sexual assault, any other crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c. 7 [N.J.S.A. 2A:30B-2], or sexual abuse as defined in section 1 of P.L.1992, c. 109 [N.J.S.A. 2A:61B-1] being committed against a minor under the age of 18, which was caused by the negligent hiring, supervision or retention of any public employee.

b. Every action at law involving a public entity or public employee as described in subsection a. of this section shall be subject to the statute of limitations set forth in section 2 of P.L.2019, c. 120 [N.J.S.A. 2A:14-2a], and may be brought during the two-year period set forth in subsection a. of section 9 of P.L.2019, c. 120 [N.J.S.A. 2A:14-2b], notwithstanding that the action would otherwise be barred through application of the statute of limitations.

2. This act shall take effect on December 1, 2019, the same day that P.L.2019, c.120 [N.J.S.A. 2A:14-2a to -2c] takes effect, and shall apply to any cause of action

32

filed on or after that date, as well as any cause of action filed prior to that effective date that has not yet been finally adjudicated or dismissed by a court as of that effective date.

The Assembly Budget Committee Statement to Chapter 239 (Assembly Bill 5392) explained the Legislature's purpose in retooling Chapter 120.

> The Assembly Budget Committee reports favorably Assembly Bill No. 5392, with committee amendments.
>
> This bill, as amended, establishes new liability standards in sexual abuse lawsuits filed against public entities and public employees. It would expressly provide that the statutory immunity from lawsuits granted to public entities and public employees pursuant to the "New Jersey Tort Claims Act," N.J.S. 59:1-1 et seq., would not be applicable with respect to the following types of sexual abuse lawsuits:
>
> — an action at law for damages against a public entity or public employee as a result of sexual abuse being committed against a person, which was caused by a willful, wanton or grossly negligent act of the public entity or public employee; or
>
> — an action at law for damages against a public entity as a result of sexual abuse being committed against a minor under the age of 18, which was caused by the negligent hiring, supervision or retention of any public employee.
>
> These types of lawsuits are the same types of lawsuits for which the general statutory immunity of the Charitable Immunity Act, P.L.1959, c.90 [N.J.S.A. 2A:53A-7 to -11] does not apply, thereby permitting such lawsuits to proceed against non-profit

organizations organized exclusively for religious, charitable, educational, or hospital purposes, and their trustees, directors, officers, employees, agents, servants and volunteers.

Based on the amendatory language set forth in the bill, any available immunity for public entities and public employees from some source of law other than the "New Jersey Tort Claims Act" could be raised by public entities and public employees as a defense to any of the aforementioned types of sexual abuse lawsuits.

. . . .

COMMITTEE AMENDMENTS

The committee amendments to the bill:

— expressly provide that only the specific immunity from lawsuits granted to public entities and public employees pursuant to the "New Jersey Tort Claims Act," N.J.S. 59:1-1 et seq., is not applicable with respect to the types of sexual abuse lawsuits described in the bill, thus any available immunity from some other source of law could be raised by public entities and public employees as a defense to any such lawsuits; and

— reword the bill's descriptions of the above described sexual abuse lawsuits for which public entities and public employees could not claim statutory immunity under the "New Jersey Tort Claims Act" to make these descriptions more consistent with how other causes of action are described under that act.

FISCAL IMPACT:

The Office of Legislative Services (OLS) expects that the bill will expose the State, school districts, and local units of government to civil claims that may result in added legal defense expenditures and substantial settlements and judgments against affected governments. The OLS, however, has no information on the number of cases that may be brought against the State, school districts, and local units of government; the number of cases that may result in a settlement or court-awarded damages against governmental entities; and the amount of settlements and damages awarded.

[Assemb. Budget Comm. Statement to A. 5392 with committee amendments (June 17, 2019).]

In our view, the Legislature's "amendment" of Chapter 120, section 7 by Chapter 239 — essentially its wholesale replacement of that section — makes plain the Legislature responded to Governor Murphy's concern about public entity liability under Chapter 120, by shifting N.J.S.A. 59:2-1.3 from a liability predicate ("a public entity is liable in an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act . . . or sexual abuse") to an immunity provision ("immunity from civil liability granted by that act to a public entity or public employee shall not apply to an action at law for damages as a result of a sexual assault, any other crime of a sexual nature, a prohibited sexual act . . . or sexual abuse . . . being committed against a person, which was caused by a

willful, wanton or grossly negligent act of the public entity or public employee"). See DiProspero v. Penn, 183 N.J. 477, 492 (2005) (noting "the best indicator of [legislative] intent is the statutory language").

If we had any doubt about the plain meaning of the text, which we don't, it would be put to rest by the Assembly Budget Committee's Statement that the amendments it made to Chapter 129, passed by both houses and signed by the Governor,

> expressly provide that only the specific immunity from lawsuits granted to public entities and public employees pursuant to the "New Jersey Tort Claims Act," N.J.S. 59:1-1 et seq., is not applicable with respect to the types of sexual abuse lawsuits described in the bill, thus any available immunity from some other source of law could be raised by public entities and public employees as a defense to any such lawsuits.

The statutory text along with the Assembly Budget Committee Statement establish unequivocally that Chapter 239 was intended to disable any immunity provided by the Tort Claims Act to a public entity or to a public employee for their willful, wanton or grossly negligent acts in sexual abuse cases.[12] See Roberts v. State, Div. of State Police, 191 N.J. 516, 521 (2007)

---

[12] The text also disables any Tort Claims Act immunity a public entity has for sexual assault or abuse committed against a minor under eighteen caused by

36                                                                A-0366-22

the entity's negligent hiring, supervision or retention of any public employee, N.J.S.A. 59:2-1.3(a)(2), mirroring N.J.S.A. 2A:53A-7.4. The Court held many years ago that the Tort Claims Act provides no immunity to a public entity for negligent, hiring, supervision or retention. See Frugis, 177 N.J. at 268-70 (affirming directed verdict for Frugis on negligent supervision claim against the school board).

As to the provision of N.J.S.A. 59:2-1.3(a)(1) disabling any immunity the Act provides a public employee for claims arising out of sexual assault or abuse caused by a willful, wanton or grossly negligent act — mirroring the limited immunity provided the employees of charitable organizations in N.J.S.A. 2A:53A-7(c) — the Tort Claims Act provides no immunity to public employees for such conduct. N.J.S.A. 59:3-1(a) makes public employees liable for injury caused by their acts or omissions to the same extent as private persons, except as otherwise provided by the Act. N.J.S.A. 59:3-1 Task Force Comment. Further, N.J.S.A. 59:3-14(a) expressly provides that "[n]othing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." But see N.J.S.A. 59:3-1(c) providing "[a] public employee is not liable for an injury where a public entity is immune from liability for that injury."

Subsection (c) was added by amendment to 59:3-1 in response to the Court's holding in in Chatman v. Hall, 128 N.J. 394 (1992) that public employees could be held liable for dangerous conditions of public property in cases where the entity was immune. See Velez, 180 N.J. at 290-91 (explaining the amendment was intended "to create a parallel liability scheme for public employees and public entities").

In the event a public employee is found liable for an act of sexual assault or abuse outside the scope of his employment — thus leaving his public employer without liability under 59:2-2(a) — N.J.S.A. 59:2-1.3(a)(1) would presumably deprive the employee of the immunity provided him in 59:3-1(c), consonant with 59:3-14(a).

(noting usefulness of "legislative history, sponsors' statements, committee reports, and other extrinsic evidence" in ascertaining legislative intent). As both the statutory language and the legislative history make clear, N.J.S.A. 59:2-1.3, as amended by Chapter 239, strips public entities of those Tort Claims Act immunities that might otherwise absolve them of liability in sexual abuse cases; it does not provide a statutory predicate for the vicarious liability of public entities for sexual assault or abuse committed outside a public employee's scope of employment. See N.J.S.A. 59:2-1(a), 2-2(a).

Even having resolved, however, that N.J.S.A. 59:2-1.3, as amended, has not effected any change in the Act's liability predicates, we are still left with the same problem we confronted in E.C. — that "N.J.S.A. 59:2-1.3(a) does not specify what provisions of the Tort Claims Act it intended to disable." 470 N.J. Super. at 53. As Margolis and Novack put it: "[s]ubsection (a)(1) purports only to eliminate pre-existing immunities for the entity or its employee when either . . . has acted 'willfully, wantonly or with gross negligence' in causing damages resulting from crimes and other acts constituting sexual assault or abuse," without identifying "what those immunities might have been." Cmt. on N.J.S.A. 59:2-1.3, at 42. In E.C. we held that N.J.S.A. 59:2-10, which states that "[a] public entity is not liable for

the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct," is an immunity "that is disabled" in sexual abuse cases by N.J.S.A. 59:2-1.3.[13] 470 N.J. Super. at 53-54, 56.

E.C. however, is not helpful to Hornor here. Hornor concedes the sexual abuse committed by Hutler was committed outside the scope of his employment. See Cosgrove, 215 N.J. Super. at 562-63 (holding social worker-therapist's sexual relationship with his patient was outside his scope of employment under Restatement (Second) of Agency § 228 (1958) adopted in New Jersey). See also Davis, 209 N.J. at 303 ("[o]nly rarely will intentional torts fall within the scope of employment").

N.J.S.A. 59:2-10 provides immunity to a public entity from vicarious liability for crimes, actual fraud, actual malice, or willful misconduct committed by an employee within the employee's scope of employment, for

---

[13] We agree with the holding in E.C. that N.J.S.A. 59:2-10 is a public entity immunity disabled under N.J.S.A. 59:2-1.3, at least as to willful, wanton or grossly negligent conduct in cases of sexual assault or abuse. 470 N.J. Super. at 54. We also agree that N.J.S.A. 59:9-2(d) is not an immunity and thus not disabled under N.J.S.A. 59:2-1.3. Ibid. We reject E.C.'s referring to the Act's statutory predicates for liability as "limitations on liability," however, as it suggests to us "[a] statute imposing liability with specified exceptions," that is "limitations on liability," instead of the form chosen for the Tort Claims Act, one providing "that public entities are immune from liability unless they are declared to be liable by an enactment." N.J.S.A. 59:2-1 Task Force Comment.

which the entity would otherwise be liable by virtue of N.J.S.A. 59:2-2(a), the Act's vicarious liability predicate. See Fielder v. Stonack, 141 N.J. 101, 130 (1995) (denying summary judgment to officer involved in a police chase based on material issue of disputed fact as to officer's willful misconduct occurring in the scope of his employment but granting summary judgment to his Township employer, because if the officer's "conduct is found to constitute willful misconduct, the Township is not liable for his actions. N.J.S.A. 59:2-10. If, however, his conduct does not rise to the level of willful misconduct, both he and the Township are granted immunity under [N.J.S.A. 59:]5-2(b)(2)"). See also N.J.S.A. 59:3-14(a) ("Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct") (emphasis added); Cosgrove, 215 N.J. Super. at 563 (noting in the absence of a basis for vicarious liability under 59:2-2 of the Tort Claims Act, the public entity's immunity under 59:2-10 is irrelevant).

Disabling the Board's immunity under N.J.S.A. 59:2-10 from liability for acts committed within the scope of Hutler's employment under N.J.S.A. 59:2-1.3, still leaves Hornor without a statutory predicate for the Board's vicarious liability for acts Hornor concedes were committed outside the scope of Hutler's

employment. "[P]laintiffs alleging negligence must first establish the predicates for liability, and later avoid application of any provision granting the sovereign immunity." Kolitch, 100 N.J. at 502 (Handler J., dissenting). It doesn't benefit a plaintiff to avoid a statutory provision granting the public entity immunity, like 59:2-10, unless he has managed to establish a predicate for liability first. See Cosgrove, 215 N.J. Super. at 563

Relying on Governor Murphy's Statement on signing Chapter 120, that "public entities should be held to the same standard of liability that is applied to religious and nonprofit organizations," Hornor contends that Chapter 239 "expressly and intentionally makes the liability of a public entity equal to that of a charitable entity," and thus the Board "may now also be held vicariously liable for Hutler's acts of sexual abuse," although outside the scope of his employment, under the aided-by-agency theory recognized by the Court in Hardwicke. We thus turn to consider Hardwicke and the 2019 amendments to the Charitable Immunity Act and their effect, if any, on Hornor's effort to hold the Board vicariously liable for the sexual assault committed by Hutler outside the scope of his employment.

41

<u>The Charitable Immunity Act, Hardwicke and the 2019 amendments</u>

Our Supreme Court abolished charitable immunity in 1958 in three decisions issued on the same day, <u>Collopy v. Newark Eye and Ear Infirmary</u>, 27 N.J. 29, 47-48 (1958), <u>Dalton v. St. Luke's Catholic Church</u>, 27 N.J. 22, 27-28 (1958) and <u>Benton v. YMCA</u>, 27 N.J. 67, 71-72 (1958). "Within a week, the Legislature acted to restore the doctrine by introduction of an act to provide immunity for all nonprofit corporations organized for religious, charitable, educational, or hospital purposes from negligence suits brought by any person who was a beneficiary, to whatever degree, of the organization's works."[14] <u>Schultz v. Roman Cath. Archdiocese of Newark</u>, 95 N.J. 530, 536-37 (1984). As the Court has since noted, "the effect of this statute was to reinstate the common law doctrine as it existed prior to its demise at the hands of the 1958 trilogy of <u>Benton</u>, <u>Collopy</u> and <u>Dalton</u>." <u>Tonelli v. Bd. of Educ. of Twp. of Wyckoff</u>, 185 N.J. 438, 444 (2005) (quoting <u>Parker v. St. Stephen's Urban Dev. Corp., Inc.</u>, 243 N.J. Super. 317, 323 (App. Div. 1990)).

In 1984, the Supreme Court in <u>Schultz</u>, a case involving the suicide of a child after he was sexually abused by a Franciscan employed by the Roman

---

[14] Justice Hoens provides a detailed history of the Charitable Immunity Act in her dissent in <u>P.V. ex rel. T.V. v. Camp Jaycee</u>, 197 N.J. 132, 163-71 (2008).

Catholic Archdiocese of Newark, held the charity was not liable to the boy's parents for its alleged "reckless, careless, and negligent" hiring of the boy's abuser and "in failing to supervise him." 95 N.J. at 532. Justice Handler, joined by Justices Schreiber and Pollock, dissented, asserting "[a]n unstrained reading of the statutory language conveys the clear meaning that the wrongful conduct that is the focus of the statute consists of 'negligence.' There is not the slightest linguistic hint that . . . 'negligence' . . . denotes anything other than ordinary negligence." Id. at 542 (Handler J., dissenting). Justice Handler maintained "the [charitable] immunity statute has no application to the victim of an intentional tort committed by a dangerous employee of a charity." Id. at 552 (Handler J., dissenting).

In 1995, the Legislature amended the Act, extending immunity to a charity's trustees, directors, officers, employees, agents and volunteers, but specifically denying those individuals immunity for any "willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature." L. 1995, c. 183, § 1 (codified at N.J.S.A. 2A:53A-7(a) and -7(c)). "That amendment did not make the charity itself liable to a victim of sexual abuse; it did, however, strip immunity from employees, officers, and volunteers, who otherwise would be within the broad

A-0366-22

scope of the Act's historically protective sweep." P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 170 (2008) (Hoens, J., dissenting).

In 2005, the Legislature again amended the Act, this time declaring that the immunity provided to the charity "shall not apply to a claim in any civil action that the negligent hiring, supervision or retention of any employee, agent or servant resulted in a sexual offense being committed against a person under the age of 18 who was a beneficiary of the nonprofit organization." L. 2005, c. 264 § 1 (codified at N.J.S.A. 2A:53A-7.4). See P.V. ex rel. T.V. v. Camp Jaycee, 393 N.J. Super. 19, 27 n.3 (App. Div. 2007) (noting as the plaintiff was a twenty-year-old, the "case would not fall within [N.J.S.A. 2A:53A-7.4's] exception to the Charitable Immunity Act even if plaintiffs' complaint could be read to assert a claim for Camp Jaycee's alleged negligent hiring, supervision or retention of employees"), aff'd, 197 N.J. 132 (2008).

Further, the Legislature made the law applicable to pending actions and to any action for which the statute of limitations had yet to expire. L. 2005, c. 264, § 2 (codified at N.J.S.A. 2A:53A-7.5). The Senate Judiciary Committee's Statement to the bill specifically referenced the Court's holding in Schultz, and that the bill would make the Charitable Immunity Act inapplicable in such cases. S. Judiciary Comm. Statement to S. 540 (March 1, 2004).

44

The following year, in Hardwicke, the Court adopted the position of the dissenters in Schultz, holding the Charitable Immunity Act "immunizes charitable entities for negligence only," "and not 'other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior.'" 188 N.J. at 97, 99 (quoting Schultz, 95 N.J. at 542) (Handler, J., dissenting). The Court found the Legislature's 2005 amendment eliminating immunity for negligent hiring resulting in the sexual abuse of a minor, "strongly" suggested it intended to eliminate the only immunity the Charitable Immunity Act "provided — the immunity for negligence." Id. at 99.

The Court in Hardwicke also found the Boychoir School was "a 'person' standing 'in loco parentis' within a 'household'" to its boarding students, thus establishing it could be held liable as a "passive abuser" under the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1. Id. at 86-94. Along with rejecting the School's argument that the Charitable Immunity Act immunized it from liability for Hardwicke's statutory claims, the Court likewise held the Act did not shield the School from Hardwicke's related common-law claims, rejecting its argument that it could not be held vicariously liable for the intentional torts of its employees occurring outside the scope of employment. Id. at 99-102.

A-0366-22

The Court held the same considerations that informed its analysis in Lehmann

v. Toys 'R' Us, Inc., 132 N.J. 587, 619-20 (1993), applied to common law

claims for child abuse that were based on a statutory violation of the Child

Sexual Abuse Act.  Id. at 102.  Given the important public policy to protect

children from sexual abuse articulated in that Act, the Court held the Boychoir

School could be held vicariously liable for common law claims based on

conduct falling within the Act's definition of sexual abuse committed by its

employees acting outside the scope of their employment under Restatement

(Second) of Agency § 219(2)(d)[15] "if an employer [had] delegate[d] the

---

[15]  Section 219 of the Restatement (Second) of Agency provides:

> (1) A master is subject to liability for the torts of his
>     servants committed while acting in the scope of
>     their employment.
>
> (2) A master is not subject to liability for the torts of
>     his servants acting outside the scope of their
>     employment, unless:
>
> (a) the master intended the conduct or the
>     consequences, or
>
> (b) the master was negligent or reckless, or
>
> (c) the conduct violated a non-delegable duty of the
>     master, or

authority to control the work environment to a supervisor and [the] supervisor abuse[d] [the] delegated authority" or "the authority delegated by the employer to the supervisor aided the supervisor in injuring the plaintiff."[16] Hardwicke, 188 N.J. at 100-02 (quoting Lehmann, 132 N.J. at 620) (alterations in original).

Thus, to summarize the state of the law before the 2019 amendments, charitable entities were immunized under the Charitable Immunity Act for only simple negligence following the Court's 2006 decision in Hardwicke and were without even that immunity for claims of negligent hiring, supervision or retention resulting in the sexual abuse of a child under the age of eighteen

---

(d) the servant purported to act or to speak on behalf
of the principal and there was reliance upon
apparent authority, or he was aided in
accomplishing the tort by the existence of the
agency relation.

[16] The Court also referenced its extension of the holding in Lehmann to claims brought under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -9 in Abbamont v. Piscataway Township Board of Education, 138 N.J. 405, 415-18 (1994). Hardwicke, 188 N.J. at 101-02. The discussion of vicarious liability in Abbamont, however, was focused on the employer's liability for a supervisor's acts within the scope of employment consistent with the statute's definition of "'retaliatory action' as 'the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment.'" Abbamont, 138 N.J. at 414 (quoting N.J.S.A. 34:19-2(e)).

following the enactment of N.J.S.A. 2A:53-7.4 in 2005. After <u>Hardwicke</u>, employers qualifying as passive abusers under the Child Sexual Abuse Act could also be held vicariously liable for common law claims based on conduct falling within the Act's definition of sexual abuse committed by their employees acting outside the scope of their employment in accord with section 219(2)(d) of the <u>Restatement (Second) of Agency</u>. A nonprofit entity's trustees, directors, officers, employees, agents and volunteers enjoyed charitable immunity for tort claims alleging negligence but were without immunity for any "willful, wanton or grossly negligent act of commission or omission, including sexual assault and other crimes of a sexual nature" pursuant to N.J.S.A. 2A:53A-7(a) and -7(c).

Against that backdrop, we consider the 2019 amendments to the Charitable Immunity Act. Chapter 120 amended two provisions of the Act — N.J.S.A. 2A:53A-7(c) and N.J.S.A. 2A:53A-7.5.

N.J.S.A. 2A:53A-7(c) was amended to provide:

> c. Nothing in this section shall be deemed to grant immunity to: (1) any <u>nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes, or its</u> trustee, director, officer, employee, agent, servant or volunteer<u>,</u> causing damage by a willful, wanton or grossly negligent act of commission or omission, including sexual

assault ~~and~~, any other ~~crimes~~ crime of a sexual nature, a prohibited sexual act as defined in section 2 of P.L.1992, c. 7 [N.J.S.A. 2A:30B-2], or sexual abuse as defined in section 1 of P.L.1992, c. 109 [N.J.S.A. 2A:61B-1]; (2) any trustee, director, officer, employee, agent, servant or volunteer causing damage as the result of the negligent operation of a motor vehicle; or (3) an independent contractor of a nonprofit corporation, society or association organized exclusively for religious, charitable, educational or hospital purposes.

N.J.S.A. 2A:53A-7.5 was amended to provide:

a. The provisions of this supplementary act, P.L.2005, c. 264 [N.J.S.A. 2A:53A-7.4 et seq.], shall apply prospectively and also shall be applicable to all civil actions for which the statute of limitations has not expired as of the effective date of this act, and subsequently, not expired as of the effective date of P.L.2019, c. 120 [N.J.S.A. 2A:14-2a et seq.], including the ~~statutes of limitation~~ statute of limitations set forth in N.J.S.A. 2A:14-2, section 2 of P.L.2019, c. 120 [N.J.S.A. 2A:14-2a], section 1 of P.L.1964, c. 214 [N.J.S.A. 2A:14-2.1], ~~section 1of P.L.1992, c. 109 [N.J.S.A. 2A:61B-1]~~ or any other statute. These applicable actions include but are not limited to matters filed with a court that have not yet been dismissed or finally adjudicated as of the effective date of this act or P.L.2019, c. 120 [N.J.S.A. 2A:14-2a et seq.].

b. Notwithstanding the provisions of subsection a. of this section, the provisions of P.L.2005, c. 264 [N.J.S.A. 2A:53A-7.4] shall apply to all civil actions for an injury resulting from an act that

49

> occurred prior to the effective date of P.L.2019, c. 120 [N.J.S.A. 2A:14-2a et seq.], and these actions shall be subject to the statute of limitations set forth in section 2 of P.L.2019, c. 120 [N.J.S.A. 2A:14-2a].

The effect of these amendments, as explained in the Statement of the Senate Judiciary Committee, (besides adding to the list of sexual offenses included in the willful, wanton and grossly negligent acts for which there is no immunity) was to codify the holding in Hardwicke "that organizational charitable immunity only applies to protect organizations from lawsuits claiming injury based on merely negligent acts, not more aggravated forms of wrongful conduct, such as willful, wanton or grossly negligent acts," including sexual assault or abuse. S. Jud. Comm. Statement to S. 477; N.J.S.A. 2A:53A-7(a). The Committee noted that prior to Hardwicke, "the Supreme Court and lower courts found that the act did shield organizations from liability for gross negligence and even intentional conduct committed by its trustees, directors, officers, employees, agents, servants, or volunteers," citing Schultz, 95 N.J. at 535-536 and Monaghan v. Holy Trinity Church, 275 N.J. Super. 594, 604 (App. Div. 1994) (holding the immunity under the Charitable Immunity Act extends to allegations of gross negligence). Ibid.

Further, the Legislature made that more limited organizational immunity, as well as the exception in N.J.S.A. 2A:53A-7.4 making charitable "organizations liable for acts of mere negligence in the hiring, supervision, or retention of an employee . . . resulting in sexual abuse committed against a minor under the age of 18," applicable to any suit filed "under the new, extended statute[s] of limitations [N.J.S.A. 2A:14-2a] . . . or . . . during the . . . two-year filing window for otherwise time-barred claims," N.J.S.A. 2A:14-2b. Ibid.

For a child victim, the limitations period is thirty-seven years after the child turns eighteen, that is, age fifty-five, or within seven years of discovery, whichever is later. N.J.S.A. 2A:14-2a(a)(1). For persons abused as adults, the limitations period is seven years after discovery. N.J.S.A. 2A:14-2a(b)(1). As noted in the Statement of the Judiciary Committee, "[t]he retroactive expansion of organizational liability under [N.J.S.A. 2A:53A-7(c)] does not create any additional retroactive liability for trustees, directors, officers, employees, agents, servants, or volunteers, as they were always generally liable for their own willful, wanton or grossly negligent acts," N.J.S.A. 2A:53A-7(c). S. Jud. Comm. Statement to S. 477. The same is true of the retroactive expansion of the Act's exception for organizational liability

51

for negligent hiring resulting in the sexual abuse of a minor, N.J.S.A. 2A:53A-7.4, as "[t]he standard immunity for negligent acts provided to such persons by the Charitable Immunity Act, as amended in 1995 . . . is not pierced by the exception established in P.L.2005, c.264 [N.J.S.A. 2A:53A-7.4]." Ibid.

Thus, far from signaling a "sea change in the law," as Hornor's counsel asserts, the 2019 amendments to the Charitable Immunity Act largely codified the limits of the law of charitable immunity as it has existed for nearly the last twenty years. The change is its applicability to cases like this one in which the events took place almost forty-five years ago when Hornor was a freshman in high school in 1978 and 1979. Stated differently, the 2019 amendments to the Charitable Immunity Act didn't broaden liability for non-profit entities, it lengthened it — significantly.[17]

---

[17] That is not true of all the changes included in the 2019 Crime Victims Act. Besides disabling immunities provided to public entities in N.J.S.A. 59:2-10, the amendment to the Child Sexual Abuse Act, N.J.S.A. 2A:61B-1, by Chapter 120 broadened the category of passive abusers who could be liable under the statute to include persons standing in loco parentis "who knowingly permit[] or acquiesce[] in sexual abuse," removing the requirement that those persons be "within the household," although that change was made prospective only. L. 2019, c. 120 §§ 4, 2, 9 (May 13, 2019) (codified at N.J.S.A. 2A:61B-1(a)(1), 61B-1(b), 14-2a(a)(1), 14-2b(a)); S. Jud. Comm. Statement to S. 477 § 4. See also Doe ex rel. Doe v. Small, 654 F. Supp. 3d 376, 401-02 (D.N.J. 2023)

<u>The effect of the 2019 amendments on plaintiff's vicarious liability claims</u>

Although we have no hesitation in agreeing with Hornor's counsel that in enacting Chapter 239, the Legislature expressly disabled, retroactively, any immunity afforded a public entity by the Tort Claims Act for willful, wanton or grossly negligent acts resulting in sexual assault or abuse, as well as any immunity for negligent hiring, supervision and retention resulting in the sexual abuse of a minor, mirroring provisions of the Charitable Immunity Act, including those changes made in the 2019 amendments,[18] we do not agree the

_____

(dismissing claim against school district relying on the Senate Judiciary's Statement "that the removal of 'in the household' from the [Child Sexual Abuse Act] is 'intended to only apply prospectively'").

[18] Owing to the complicated structure of the Tort Claims Act, however, achieving symmetry between it and the Charitable Immunity Act in the two types of actions contemplated in the 2019 amendments is challenging. And it would appear that even after the 2019 amendments, the immunity provided charitable entities by the Charitable Immunity Act remains broader than that provided public entities under the Tort Claims Act.

For example, N.J.S.A. 2A:53A-7(c) of the Charitable Immunity Act, as amended, immunizes charitable entities from claims of negligence, including for acts or omissions resulting in sexual assault or abuse, while the Tort Claims Act has long been held not to provide a public entity <u>any</u> immunity for such claims in its in loco parentis role. <u>See</u> <u>Jerkins ex rel. Jerkins v. Anderson</u>, 191 N.J. 285, 289, 295 (2007) (holding in recognition of the many "foreseeable dangers" children face during the school day, "a school's duty to exercise reasonable care for the children in its custody is integral to our public

53

education system"); Frugis, 177 N.J. at 270 ("School personnel owe a duty to exercise reasonable care for the safety of students entrusted to them.").

We, thus, disagree with the example in E.C. that N.J.S.A. 59:2-1.3(a)(1) "would apply when a public entity is an occupier of real property — like a school — and provides woefully inadequate security, thereby allowing a predator to enter the school and commit a sexual crime against a student." 470 N.J. Super. at 50. We are of the opinion "the acts or omissions of the public entity" in that instance would be assessed based on the duty of reasonable care, as in Jerkins and Frugis, not "through application of the willful, wanton or grossly negligent standard" of 59:2-1.3(a)(1). Ibid. Applying N.J.S.A. 59:2-1.3(a)(1) in that example would immunize a public entity for its negligence, contrary to cases, like Jerkins and Frugis, that have not found any immunity available in the Tort Claims Act for those entities under the circumstances.

The duty of the public entity would be different if it did not stand in loco parentis to the claimant. See Foster v. Newark Hous. Auth., 389 N.J. Super. 60, 66 (App. Div. 2006) (claimant alleging injury based on inoperable lock must establish housing authority failed to prevent dangerous condition of public property under N.J.S.A. 59:4-2 (citing Bligen v. Jersey City Hous. Auth., 131 N.J. 124, 136-37 (1993))). But a claimant would be obligated to demonstrate the entity had been palpably unreasonable, notwithstanding the dangerous condition of the entity's property, as it constitutes a predicate for liability. N.J.S.A. 59:4-2 ("Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable."); Kolitch, 100 N.J. at 492-93.

Likewise, a public entity, even without in loco parentis responsibilities, is not immunized by the Tort Claims Act for claims of negligent hiring, supervision and retention regardless of the age of the claimant or the nature of the injury. See Hoag v. Brown, 397 N.J. Super. 34, 54-55 (App. Div. 2007) (holding the vicarious liability immunity provided public entities in N.J.S.A. 59:2-10 does not bar a direct claim against the entity for negligent hiring, retention and supervision). Thus, adding 59:2-1.3(a)(2) to the Act, to mirror N.J.S.A.

Board "may now also be held vicariously liable for Hutler's acts of sexual abuse," although outside the scope of his employment, under the aided-by-agency theory recognized by the Court in Hardwicke.

Hornor's counsel fundamentally misapprehends the effect of the 2019 amendments on the Charitable Immunity Act and, ultimately, on the viability of Hornor's vicarious liability claims against the Board under the Tort Claims Act.  In our view, the 2019 amendments to those two statutes have not had, nor were intended to have had, any effect on the law of agency as applied to either nonprofit organizations or public entities.

There is absolutely no indication in either the text of N.J.S.A. 2A:53A-7(c) of the Charitable Immunity Act or its legislative history to indicate the Legislature intended anything other than to codify the central holding in Hardwicke that the Charitable Immunity Act "immunizes simple negligence only, and not 'other forms of aggravated wrongful conduct, such as malice or fraud, or intentional, reckless and wanton, or even grossly negligent behavior.'"  188 N.J. at 97 (quoting Schultz, 95 N.J. at 542 (Handler, J.,

---

2A:53A-7.4, the 2005 statute excepting claims of negligent hiring, supervision or retention resulting in the sexual abuse of a youth under eighteen from the immunity otherwise provided charitable organizations, did not alter the already existing broader duty of public entities because 59:2-1.3, by its terms, only disables immunities "granted by that act."

dissenting)). To state the obvious, the Charitable Immunity Act is a statute addressing the immunity of charitable entities for tort claims, not a statute addressing the common law doctrine of respondeat superior.

The 2019 amendments to the Charitable Immunity Act codified, and made retroactive, the holding in Hardwicke that charitable entities have no immunity for willful, wanton or grossly negligent acts and also made retroactive the exception in N.J.S.A. 2A:53A-7.4, providing charitable entities have no immunity whatsoever for claims of negligent hiring, supervision or retention resulting in a sexual offense being committed against a beneficiary under the age of eighteen. The 2019 amendments likewise disabled any immunities the Tort Claims Act provided public entities that might otherwise absolve them of liability in sexual abuse cases for willful, wanton or grossly negligent acts, identified in E.C. as N.J.S.A. 59:2-10, which immunizes a public entity "for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." 470 N.J. Super. at 53-55. As already noted, however, that statute immunizes a public entity from acts or omissions committed by an employee within the employee's scope of employment, for which the entity would otherwise be liable by virtue of N.J.S.A. 59:2-2(a). It does not provide a liability predicate for Hornor's claim

A-0366-22

that the Board is vicariously liable for Hutler's sexual assault, which Hornor admits was committed outside the scope of Hutler's employment.

As the Supreme Court noted in Davis, "[t]he primary focus of [Hardwicke]," beyond its landmark holding reinterpreting the scope of immunity provided by the Charitable Immunity Act, "was the impact of the [Child Sexual Abuse Act], in which the Legislature provided for a private right of action against a 'passive abuser' who knowingly permits or acquiesces in the sexual abuse of a child." 209 N.J. at 290. Having decided that Hardwicke had "stated a statutory cause of action against the School for sexual abuse" under the Child Sexual Abuse Act and was not barred from pursuing claims for "willful, wanton or grossly negligent conduct" under the Charitable Immunity Act, the Court held Hardwicke could "pursue his statutory cause of action and any common-law claims he may have that are based on willful, wanton or grossly negligent conduct, and/or negligent hiring, supervision and retention" against the Boychoir School. Hardwicke, 188 N.J. at 99.

Recalling the "important public policies" the Legislature sought to vindicate in the Law Against Discrimination and the Conscientious Employee Protection Act that had impelled the Court to adopt section 219(d) of the Restatement (Second) of Agency as the appropriate framework for evaluating

employer liability in employment discrimination and retaliation cases, the

Court held:

> The considerations that informed our analyses in
> Lehmann and Abbamont apply equally to claims
> predicated on facts indicating child abuse. . . . [T]he
> [Child Sexual Abuse Act] recognizes the vulnerability
> of children and demonstrates a legislative intent to
> protect them from victimization.  In our view,
> common-law claims based on child abuse are
> supported by the same compelling rationale.  The
> [Child Sexual Abuse Act] imposes responsibility on
> those in the best position to know of the abuse and
> stop it; application of section 219 of the Restatement
> to plaintiff's common-law claims advances those
> goals.
>
> [Id. at 102.]

Hornor's counsel's argument that "after Hardwicke, the only thing that

prevented a public school from being held vicariously liable for an employee's

sexual abuse of a child was section 59:2-10 of the [Tort Claims Act]" is

incorrect.  The reason public schools weren't liable for the sexual abuse of

their students after Hardwicke is that they didn't qualify as "passive abusers"

under the Child Sexual Abuse Act because they did not stand in loco parentis

"within the household."  See J.P. v. Smith, 444 N.J. Super. 507, 522-24 (App.

Div. 2016); D.M. v. River Dell Reg'l High Sch., 373 N.J. Super. 639, 649

(App. Div. 2004).  That, of course, changed after the 2019 amendment to the

Act deleting the "within the household" requirement. Going forward, public schools and private schools, just as any "other person standing in loco parentis who knowingly permits or acquiesces in sexual abuse" of a child, can be held directly liable as a passive abuser under the Child Sexual Abuse Act. N.J.S.A. 2A:61B-1; J.H. v. Mercer Cnty. Youth Det. Ctr., 396 N.J. Super. 1, 11 (App. Div. 2007) (relying on Hardwicke to hold county youth detention center qualified as a "person" under the Act).[19]

The 2019 amendments to the Child Sexual Abuse Act, while providing for the direct liability of an organizational entity as a passive abuser, do not address the entity's vicarious liability for sexual assault or abuse committed by

---

[19]  In Davis, both our court and the Supreme Court noted our error in J.H. in finding the Court in Hardwicke had held the Boychoir School owed a "non-delegable duty" to Hardwicke under Restatement (Second) of Agency § 219(2)(c), on which we relied to hold that "under modern principles of agency law liability of an employer for the torts of an employee acting outside the scope of his employment is permitted when the conduct violates a non-delegable duty of the employer," 396 N.J. Super. at 17. See Davis v. Devereux Found., 414 N.J. Super. 1, 10 (App. Div. 2010) (finding "no basis for reading the Court's opinion [in Hardwicke] as introducing what would clearly be a major doctrinal change respecting the law governing institutions that care for children and the disabled" by finding they owed the individuals in their care a non-delegable duty based on the Child Sexual Abuse Act), aff'd in part, and rev'd in part on other grounds, 209 N.J. at 291 n.5 (noting "to the extent that the panel deciding J.H. invoked a 'non-delegable' common-law duty, purportedly created by this Court in Hardwicke and Frugis, it misconstrued this Court's decisions in those cases").

A-0366-22

an active abuser-employee.  Whether or not a private day school qualifying as a passive abuser under the Child Sexual Abuse Act may be held vicariously liable for the sexual assault or abuse of a student occurring on or after the effective date of the 2019 amendments pursuant to the aided-by-agency clause of Restatement (Second) of Agency § 219(2)(d) under the Charitable Immunity Act — an issue not addressed in those amendments — a public school cannot be held vicariously liable for such under the Tort Claims Act.[20]

----

[20] The plaintiff in Davis did not argue that Devereux was vicariously liable for its employee's criminal act in severely scalding her developmentally disabled son, although outside the scope of employment, under the aided-by-agency theory of section 219(d)(2) of the Restatement (Second) of Agency, and the Court did not address the theory in its lengthy discussion of the doctrine of respondeat superior and section 219 in that case.  We have elsewhere noted that the aided-by-agency clause in section 219(d)(2) has proved controversial, largely because "a broad reading of its language would result in an employer's strict liability" for its employee's intentional torts committed outside the scope of employment, E.S. for G.S. v. Brunswick Inv. Ltd. P'ship, 469 N.J. Super. 279, 299 (App. Div. 2021), the same reason the Court rejected imposing a non-delegable duty on in loco parentis institutions in Davis, 209 N.J. at 291-92 ("The liability of in loco parentis institutions has [previously] been determined in accordance with traditional negligence principles; the 'non-delegable' duty proposed here, amounting to an employer's absolute liability for an employee's criminal act, has not been accepted by this Court in any setting similar to that of this case.").  See also Aguas v. State, 220 N.J. 494, 511 (2015) (explaining the Court had "declined to hold employers strictly liable for hostile work environment sexual harassment by supervisors" in Lehmann because it had concluded that "in some cases strict liability would be unjust — for example, 'where a supervisor rapes one of his subordinates in the workplace'") (quoting

N.J.S.A. 59:2-2(a) allows for liability of a public entity "for injury proximately caused by an act or omission of a public employee" only "within the scope of his employment."[21] As section 219(2)(d) addresses an employer's

Lehmann, 132 N.J. at 623-24 (quoting T.L. v. Toys 'R' Us, 255 N.J. Super. 616, 661 (App. Div. 1992) (Skillman, J.A.D., dissenting))).

Although the Davis majority noted it did "not reach the issue of whether the 'non-delegable' or absolute duty at issue, were such a duty to be recognized, would be barred by the [Charitable Immunity Act]," the dissenters countered that "[a]ny analysis of the implications of [N.J.S.A. 2A:53A-7] would also be subject to this Court's holding in Hardwicke," 188 N.J. at 97, 100-02. Davis, 209 N.J. at 302 n.10, 319. We note the Legislature has not waived the State's sovereign immunity for strict liability claims. Strict liability claims against public entities are expressly barred by N.J.S.A. 59:9-2(b). The American Law Institute abandoned the aided-by-agency theory of vicarious liability in its Restatement (Third). Restatement (Third) of Agency § 7.08 cmt. b. (2006); E.S., 469 N.J. Super. at 295-96.

[21] Hornor's contention that 59:2-2(a) is no impediment to establishing the Board's vicarious liability for Hutler's sexual assault because that subsection provides for a public entity's vicarious liability for injury caused by a public employee "within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances," and "our Supreme Court has already determined that a private entity may be held vicariously liable for the sexual abuse of a student committed by its employee in Hardwicke" is without sufficient merit to warrant extended discussion here. See R. 2:11-3(e)(1)(E).

The Court in Hardwicke held the Boychoir School, against which Hardwicke had stated a statutory claim as a passive abuser under the Child Sexual Abuse Act, could be held vicariously liable for the intentional torts of its employees committed outside the scope of employment under Restatement (Second) of Agency § 219(2)(d). See E.S., 469 N.J. Super. at 301. A public entity is not

61

liability for conduct occurring outside the scope of employment, it does not provide a basis for holding a public entity, like the Board, liable under the Tort Claims Act. Hornor's failure to identify a liability predicate in the Act for the Board's vicarious liability for Hutler's sexual assault is fatal to Hornor's vicarious liability claim against the Board. See Tice, 133 N.J. at 355 (reiterating "[t]he liability of the public entity must be found in the Act");

---

liable for the intentional torts of its employees outside the scope of employment in the same manner a private entity is liable because the Legislature has deemed a public entity is only vicariously liable for the acts or omissions of its employees occurring within the scope of employment, 59:2-2(a); and 59:2-1.3(a)(1) only disabled a public entity's immunity for sexual assaults or abuse under 59:2-10, E.C., 470 N.J. Super. at 53-54, which absolves a public entity of liability "for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct" occurring within the scope of employment for which it would otherwise be liable under 59:2-2(a), Fielder, 141 N.J. at 123, 130.

Thus, N.J.S.A. 59:2-2(a) is an absolute barrier to Hornor's vicarious liability claims because the Board can only be held liable for the acts of its employees occurring within the scope of employment. Hornor concedes Hutler's assault did not occur within the scope of his employment, and Restatement (Second) of Agency § 219(2)(d) ("A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless: . . . (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation") and the vicarious liability holding in Hardwicke address an employer's liability only for acts of its employees outside the scope of employment. There is simply no provision in the Tort Claims Act making a public entity liable for injury proximately caused by an act or omission of a public employee acting outside the scope of employment even after the 2019 amendments and the enactment of 59:2-1.3.

A-0366-22

Kolitch, 100 N.J. at 502 (Handler J., dissenting) (explaining a plaintiff bringing a negligence action against a public entity "must first establish the predicates for liability, and later avoid application of any provision granting the sovereign immunity"); Troth, 117 N.J. at 276-77 (O'Hern J., concurring) (same).

We reverse the trial court's denial of the Board's motion to dismiss those counts of Hornor's complaint asserting claims for breach of fiduciary duty and vicarious liability and remand for the dismissal of those counts with prejudice. Our holding does not impair Hornor's ability to proceed on his direct claim against the Board for negligent hiring, supervision and retention, which is, of course, not limited to acts Hutler committed within the scope of his employment. See Schultz, 95 N.J. at 534-35 ("Under respondeat superior, an employer is liable only for those acts of his employee committed within the scope of employment, while negligent hiring reaches further to cover acts outside the scope of employment."); G.A.-H., 238 N.J. at 415 ("Unlike respondeat superior, negligent hiring, supervision, and training are not forms of vicarious liability and are based on the direct fault of an employer.").

Reversed and remanded for further proceedings not inconsistent with our opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0366-22